## BIG COTTONWOOD TANNER DITCH CO.
## v. MOYLE et al.

No.. 6721.   Decided November 7, 1946.   (174 P. 2d 148.)

See 67 C. J. Waters, sec. 1042; 17 Am. Jur. 993; 30 Am. Jur. 638.

*T. D. Lewis, O. W. Moyle, Jr., Dan T. Moyle* and *David T. Lewis*, all of Salt Lake City, for appellants.

*Shirley P. Jones,* of Salt Lake City, for respondent.

*J. A. Howell,* of Ogden, *A. V. Watkins,* of Provo, *Elias Hansen* and *Fisher Harris,* both of Salt Lake City, *A. H. Christenson,* of Provo, *Wendell Day,* of Murray, *Dean F. Brayton,* of Salt Lake City, *David K. Holther,* of Ogden, *Homer Holmgren, D. Howe Moffat* and *A. C. Melville,* all of Salt Lake City, *Young & Bullen,* of Logan, *E. R. Christensen,* and *Harold E. Wallace,* both of Salt Lake City, amici curiae on rehearing.

WOLFE, Justice.

A petition for hearing has been filed in behalf of plaintiff below. Our original opinion in this case, 109 Utah 197, 159 P. 2d 596, reversed the judgment of the lower court and remanded the case with instructions to dissolve the injunction.

Mr. Justice Wade in the court's original opinion of the case clearly stated the facts as follows:

"Plaintiff, respondent herein, an irrigation company, as the owner of easements for its ditches and canals which extended across tracts of land owned by defendants, appellants herein, brought this suit to enjoin the defendants from preventing it from entering upon their lands for the purposes of cementing and waterproofing its ditches.

"The defendants are the owners of considerable tracts of land valuable chiefly for residential purposes. They admitted that palintiff was the owner of easements over their respective lands and that these

easements consisted of ditches and canals through which coursed water belonging to plaintiff. Oscar W. Moyle, one of the defendants, claimed to be a tenant in common with plaintiff as to the canals and ditches crossing his land; all of the defendants were stockholders in plaintiff company.

"Plaintiff decided to waterproof its ditches to avert a loss of water. Defendants objected to this because there had grown up around the streams * * * flora and trees which greatly enhanced the value of their properties for residences. The properties were not valuable for farming purposes and if the ditches were waterproofed many trees, such as tag alder and birch, would die for lack of sufficient water. This [it was claimed] would decrease the beauty of the tracts to such an extent that their value for residential purposes would be lessened approximately 50%. They also objected that the manner in which plaintiff proposed to make these alterations in its ditches would make the streams more dangerous to children. Besides cementing the ditches, plaintiff proposed to make the channels narrow so that the water could course through in a swifter current, thus saving considerable loss of water from seepage [and evaporation].

"The case was tried to the court without a jury and it found that plaintiff's easement entitled it to enter upon defendant's lands for the purpose of constructing, maintaining and repairing its distribution system consisting of ditches, canals, laterals, drains and weirs and also for the purpose of conserving and conveying its water through said distribution system, and therefore granted the injunction. However, the court also found that the manner in which the plaintiff proposed to make its alterations would be more dangerous to children and so it retained jurisdiction of the case to be able to pass upon any proposed alteration for the purpose of determining whether it would be done in such a manner as would not make it more dangerous to children and would not materially depreciate the value of the land for residential purposes.

"Defendants appeal from the order and judgment enjoining them from interfering with the prosecution of the works by plaintiff and plaintiff cross-appeals from the court's finding and judgment that it retain jurisdiction of the case to see that the works are carried out under the conditions imposed in the decree."

No rights to water are involved in this case as defendants concede that they have no rights to the use of the seepage water and that plaintiff may abandon the ditch in question and conduct its water to the place of use over a different route without responding in damages to defendants for losses resulting from thus cutting off the water supply of

the foliage which had grown up along the banks of the ditches. The word "ditches" as used in the opinion refers to all irrigation facilities involved in the case—ditches, canals, weirs, laterals, etc.

Counsel for plaintiff argued vigorously that the easement involved was acquired by express grant from the United States by virtue of a July 26, 1866, act of Congress. Defendants contend plaintiff acquired its easement by prescription. Under both plaintiff's and defendants' theory, the plaintiff has only an easement. How that easement was acquired is immaterial to the result of this case. We will assume the plaintiff has merely a prescriptive easement as defendants contend.

In the lower court in opposition to plaintiff's requested relief, defendants made the following three contentions:

1. The prescriptive easement plaintiff has to course irrigation water across defendants' land is mutual and co-existent with defendants' right to the benefit of having seepage water nurture the flora along the banks of said ditches. To waterproof the ditches will cut off the seepage water and plaintiff may not continue to use its easement unless it continues to allow defendants the benefits from said use.

2. The method plaintiff proposes to use to improve its ditches will add additional burdens to the servient estates by making the ditches materially more dangerous to children thus substantially depreciating the value of the servient estates for residential purposes—for which purposes they are chiefly used and suitable.

3. One of the defendants—Mr. Moyle—is a tenant-in-common with the plaintiff irrigation company in the ditches and a tenant-in-common may not materially change the property enjoyed in common without consent of the other common tenants if the change will make the estates less convenient or useful to the tenant-in-common who opposes the change.

We will discuss the contentions in that order.

There existed under the English common law the conception that an easement may not only be a restriction of the property rights of the servient tenant, but where the facts of the grant or user warrant, it may include a right to a benefit by the servient estate. *Carlisle* v. *Cooper*, 21 N. J. Eq. 576, at page 597; *Wutchumna Water Co.* v. *Ragle, et al.*, 148 Cal. 759, 84 P. 162.

Defendants relying on this common law concept contend that in this case the plaintiff's right to have its ditch cross defendants' land is mutual and co-existent with defendants' right to have seepage water from said ditch nurture the flora along the banks of the ditch. The contention is that plaintiff may not retain its prescriptive easement if it cuts off the benefits which accrued therefrom to the defendants.

Under the common law in England the doctrine of acquiring a right by prescription presumed a grant, the title papers of which had been lost. To ascertain the terms of the grant, the law looked to the nature of the use during the prescriptive period. If incidental benefits accrued to the owner of the servient estate, it was presumed that in the absence of said benefits the owner of such estate could and would have stopped the use before the prescriptive period had run. Thus, if after the prescriptive period had run, the benefits were cut off, the servient estate owner was permitted to restrain the use.

While the principle is somewhat the same, this taking away of the benefits should be distinguished from those cases in which the owner of the easement attempts to make changes thereon which will increase the burden on the land. The former takes away a benefit which accrues as an incident to the use of the easement; the latter imposes additional burdens.

Plaintiff's first contention deals with a benefit which accrued as an incident to the use of the easement. Before the ditch involved was made across defendants' land no flora could have grown from seepage water from the ditch. The making and use of the ditch incidentally added a benefit to the land on which it was made be-

cause the seepage water therefrom supplied water for trees and plants to grow along its banks. Cutting off the seepage water is not then adding an additional burden to the servient estate but is merely taking away an incidentally accrued benefit.

Cases involving the taking away of benefits which the use of an easement confers on the servient estate apparently do not often arise, but if the common law doctrine of prescriptive rights is followed, it would logically appear that the dominant estate owner could not continue to use the easement after he prevented the accrual of benefits to the servient estate. If we are to presume a lost grant and determine the scope of the grant strictly by the use, the common law will read into the prescriptive right a limitation requiring the owner of the right to continue to use it substantially as it was used during the running of the prescriptive period. If a benefit accrues to the servient estate from the use of the easement, it would assume that absent the benefits the use would have been stopped.

Where the use is to convey irrigation water in earthen ditches, does the common law of this arid state read into the prescriptive use the implied condition that the easement for the conveyance of water could not be changed so as to deprive the servient estate of the benefits of seepage accruing from the use?

We have in the past refused to follow the English common law where to do so would be contrary to the common interests if applied in this area. Thus, in the case of *Winters* v. *Turner*, 74 Utah 222, 278 P. 816, in discussing an earlier Utah case, *Buford* v. *Houtz*, 5 Utah 591, 18 P. 633, which latter case was affirmed by the United States Supreme Court, Id., 133 U. S. 320, 10 S. Ct. 305, 33 L. Ed. 618, we noted that the common law principle of liability for trespassing animals was in the early settlement of this state ill adapted to the custom and habit of the people of this area. And in *Buford* v. *Houtz*, the Utah court and the U. S. Supreme Court refused to apply the common law rule to this unsettled country where to do so would practically

deprive the owners of livestock of the right to use the public domain. This court and the courts of neighboring states have refused to follow the English common law doctrine of riparian rights because such doctrine was not adapted to the custom, habit and needs of the people of these arid regions. *Stowell et al* v. *Johnson et al.*, 7 Utah 215, 26 P. 290.

The needs of the people of this state in reference to the use of water, together with ditches and easements for the purpose of conveying the same, are materially different from the needs of England and of many of our sister states.

Because of these differences, the common law of Utah does not read into the prescriptive easement to carry water the same content as the English common law has applied to rights of way over land. The common law of Utah presumes that at the time of this grant all parties concerned, knowing of the arid nature of this country, contemplated that at some future time the owner of the water would be required by law to prevent, or, without coercion of law, would undertake to prevent, wasteage of water as the need arose for more efficient use of the limited water available. It is reasonable in this arid area to hold that at the time of the supposed lost grant, both parties contemplated that this might be done. If this was contemplated, and the common law of Utah presumes that it was, then the owner of the easement acquired the right to carry water across the lands of another in a dirt ditch; that as water became more valuable, it was contemplated that the ditch might be improved so as to save the water; that these further developments to conserve water could be made by the owner of the easement so long, and only so long, as the new developments were reasonably made and did not unnecessarily burden the land.

In no event was the servient estate to be allowed to obtain an interest in the seepage water. No right to that benefit could be obtained by the servient estate because the common law of Utah would not read into the prescriptive use that content. Rather the Utah common law rule presumed that

the parties contemplated that that benefit might vanish because of the need to conserve water and made the grant with that very point in mind.

It has been suggested that we repudiate the common law theory of grant as the basis for the prescriptive right to an easement. That idea has been voiced in the concurring opinion of the CHIEF JUSTICE and is not without allurement. Having done considerable research in order to see whether I could not join him in the idea and because the matter may again come before this court when I am no longer a member, I shall, even at the cost of a lengthened opinion and the criticism it may engender, set out my ideas as to why I am not prepared at this time to subscribe to it.

I am in full accord with the CHIEF JUSTICE that law should comport with experience in life rather than have it become a closed system of legal concepts. I have expressed that idea in various forms at an earlier period in my judicial career when I was under the impression that some of my colleagues did not take the same view and that I was compelled to battle for the idea. In fact, I think this very case is illustrative of that philosophy. In the previous opinion I dissented because I did not think the English common law which we interpreted as putting a content into the grant for an easement right to convey water that the servient owner was entitled to the benefits of seepage water was, as so interpreted, applicable to Utah. I then had and still have doubts as to whether even under the English common law a direct benefit such as one arising out of the very use or presence of water in the easement ditch would have been held by the English courts, had it come before them, as a content of the grant. *Gray's Case,* 5 Coke 78(b), involved a monetary consideration for the easement. That is hardly a benefit incidental to the use to which the servient tenement is subject but a direct quid pro quo for the use. Be that as it may, I did not expect such a drastic conversion as would advocate doing away with the basic conception of a grant from any member of the court.

Before I could agree to sweep away the foundation of much of our law of prescriptive easements, I must be convinced that it has become outmoded and useless as the logical basis for practically the whole law of prescriptive easements. We cannot discard the theory in part and retain it in part. We cannot when it is necessary logically to support some phase or rule of that law, invoke the theory but discard it in favor of some supposedly more realistic theory when our purposes do not seem to require it. I am not yet so convinced. The principles of what may be tersely described as court-made law are not like grains of pepper or salt thrown on a table without inter-connection and relationship. Principles of such law constitute a fabric. The law has texture and continuity. That was the genius of the common law. The old masters on the bench were able to interpret it as a continuously developing and evolving system with principles inter-related and connected. My mind has likened the common law to one of those ancient Persian rugs which took generations to weave. The color of the dyes in the yarns changed during the years which accounted for the variegated colors. Even the design changed with the times but there was continuity and order in the change. The changes may in some periods be rapid and in others slow, but it is a never ending process. We must be sure that in pulling a master strand in this fabric that we do not destroy the fabric itself. The Legislature may, if acting constitutionally, do that. It is this very difference in method of action which really constitutes the difference between judicial and legislative action. It is to this idea that I shall in a moment address myself. As an introduction, let us be reminded that the old judges preserved the logic of the law by what are sometimes called fictions but seldom at the cost of substance. This was their method of keeping the law logical and yet making it serve the needs of the people. In the case of easements they were confronted with the fact that a party had, for a long time, limitedly used another's land. There was no doubt as to the fact of the use. It was an open and not a secret use. The common law judges saw that it was neces-

sary or convenient for the use of the land which came to be called the dominant tenement. They saw, too, that where such use had been made of a right of way or other convenience for a long time, the right should not be cut off because there was great likelihood that the right had been granted. *The long use was evidence of a grant.* In this respect it was not a "fiction." It later became, upon a finding of long continued open and adverse use, conclusive of a grant. In England it became almost conclusive. In this country it is generally conclusive. If the use was a long one, continuous, open and adverse, the owner of the servient tenement could not rebut the prescription of a grant. He could, of course, rebut evidence of adverseness and show that it was by permission or lease, life tenancy or he could show legal incapacity. Holdsworth's History of the English Law, Vol. 7, p. 343, et seq. That was a judicial way of getting around the dilemma. It was really introducing a substantive rule under the form of evidence—not the first time the law has done that. A presumption of death seven years after last known to be living without being accounted for is a judicially introduced presumption in analogy to certain English statutes. Jones Commentaries on Evidence, 2d Ed., Vol. I, § 285, p. 468. With their high regard for the sanctity of property, the judges could not hold that the user, after a period of use however long, could repose in the fact that he had openly, notoriously and adversely made a limited use of the property because only the Legislature could decree that a certain period of such use should give the user assurance and repose—a statute of limitation. Such, in the mind of the common law judge, would have been judicial legislation. Can we do with a limited use of another's property what only the Legislature can do in respect to the total use of another's property? The Legislature has said that after seven years of adverse use of land under claim of right, the court shall not disturb such user if he pays all taxes assessed against the land. Can we now say without employing the theory of lost grant that after 20 years or any fixed time of an adverse use of a

right of way that the user is to have a permanent easement in that land? If we repudiate the idea that the right was founded on a grant, are we not extending the statute on adverse possession for limited purposes by judicial edict 20 years and thus invading the legislative field? If we could do that for the limited use of part of another's land for 20 years, why can we not make it for a shorter or longer period? If we once throw away the common law origins of these judicial decisions and simply decree that 20 years adverse use of its own force gives a person an easement, why could we not do that for the whole land and decree that seven or ten or twenty years adverse use of land gives the person title in fee? If it can be done judicially for a limited right in another's land, why not for an unlimited right in the whole of another's land, held in adverse possession? But I understand that such is the prerogative of the Legislature and not of the judiciary and to meet Constitutional requirements the Legislature would have to permit a reasonable time for notorious, continuous and adverse possession to run.

Holdsworth in his History of the Common Law, Vol. VII, p. 351, discusses the difference between the mode of operation of a statute of limitation and the mode of operation of prescription in this wise:

"A statute of limitation generally only bars the right of action, and must generally be pleaded as a defense by the person who wishes to rely on it. The person who wishes to rely on it is in possession, and until his right of possession is disputed he has all the rights of ownership. It is not therefore unreasonable to reckon the period of possession, which will bar the action, backward from the time the action is brought, and say that possession for a fixed period before action shall bar the action. On the other hand, prescription confers a positive title to the property upon the person who enjoyed it for the fixed period. It affects title not rights of action. Therefore the period of the beginning of the enjoyment should be alone regarded, and the enjoyment from that period for the required time should confer a title, whether or not that enjoyment has been called into question."

And title limited or unlimited in another's land or by *force of adverse possession alone* is a creature of the Legisla-

ture not of the judiciary. The creation of the judiciary was an evidence of a grant by a long continued use. From this title was presumed. The right then rested on title. But so-called "title by adverse possession" was negative. The right came because the owner was not by legislative enactment permitted to assert his title—a right of repose by the user based on a type of estoppel. And it is submitted that this is the case even though in an action to quiet title after seven years adverse possession under claim of right, the court may decree title in the adverser. Affirmative title then comes from the decree and not from the adverse possession.

If we pull up the very roots out of which easements grew (that is, the presumption that there must have been a grant for the use to persist over twenty years) we are immediately thrown on the necessity of judicially legislating our own conditions of 20 years of adverse possession. I have grave doubts whether we can keep the strands of our legal fabric from becoming very much tangled by simply saying that "all the elements involved and necessary to establish a prescriptive easement are elements of adverse possession." It is true that to establish an easement the use must be notorious and continuous and on this adverseness—that is, holding against the owner—will be presumed. But the common law went back one more step and found that such use *against* and not under the owner or with his permission was evidence that the owner or his predecessors in interest had granted the right of use. The result was largely the same as the so-called title by adverse use (which did not affirmatively give the user title but by holding off the owner had that result) but the difference in the basic concept of the origin of the right actually illustrated the difference between action in the legislative and judicial fields.

Let us follow for a moment where this new theory that an easement is the product of 20 years adverse user without support of the grant conception logically leads us. I assume that the repudiation of the common law theory of title as the basis of the easement will be true as to all ease-

ments, at least as to right of way easements in land. Does it mean that an easement in gross may now be established without help of the presumption of grant theory? If not, why not? Certainly if after seven years I can gain full right to land by preventing the owner from ejecting me because of a statute, why can I not by this sort of judicial legislation gain the limited right to cut across some other person's land after seven years? If we need legislation to gain the right to resist the owner after a period of adverse possession named in the legislation, how do we gain the right of a limited use even in 20 years without legislation unless we accept the long usage as *evidence* of title? The reason given that it takes a longer time to disentitle an owner of a part of his property for a limited use than the whole of his property for all uses because it requires a longer time to establish a partial use than a full use is un-convincing and contrary to the history of the origin and development of the law of easements. The real distinction, as pointed out by Holdworth, lies in the fact that title by adverse use is obtained through legislative enactment whilst title by presumed grant came through judiciary accepting long use—first, "time whereof the memory of man runneth not to the contrary" and later, twenty years—as evidence of a grant.

There are other logical difficulties. Without the idea of an easement arising from a grant, how in any case can the servient tenement claim the *benefits* of the dominant owner's easement? In the former opinion in this case it was held that the English common law gave the servient owner that right. It was in order to get away from that result that we are now holding that the English common law in that regard does not apply to easements for irrigation ditches in Utah. But I assume that we are not laying down a general principle that the servient owner of an easement for a right of way is not in any case entitled to the benefits of the easement. So in cases other than the easement to transport water, how can a user adverse a man into a benefit? If he adverses he gains only the

right of a use limited to the manner in which he used the land. Of course, if a grant was presumed that gives flexibility. The concept that the user and the one whose land was used would agree that the latter was to receive the incidental benefits of the former's use, if any, was a natural one. We have held in this opinion that the parties in this state could not have so contemplated in the supposed grant because of the policy dating from long before statehood of encouraging measures to conserve water. But if the grant theory is repudiated for *all* right of way easements then I seem to perceive difficulty in finding any basis for giving the servient tenement any incidental benefits of the dominant owner's use. Of course, the servient owner would be able to use his land in any way he wished so long as it was not inconsistent with the easement owner's use but in the rare case where the use of the dominant owner bestows, *by virtue of that use,* a benefit on the servient owner, I think it would be logically difficult to base the origin of such benefits basically on adverse possession because as before said, the adverser would not be given rise to benefits in the adversee. He could cut them off at any time. In fact, if adverse possession is the origin of the easement I see logical difficulties in the conception that the easement owner has a right to improve the easement within the framework of its use and purposes. Why should not the law hold the adverser strictly to the right he gained by the adverse use and no more? How can rights to improve as distinguished from a right to maintain have their genesis in adverse use? That might be contemplated in a grant but how can it be said that it was contemplated in someone's use against an unwilling owner. True, the right gained by the adverser would be measured by the type, manner and extent of use during the prescriptive period but would that give a right to improve a dirt right of way by paving it or a dirt irrigation ditch by cementing it? But if it were presumed that the right arose by grant, certainly it could be assumed that the grant of title to the use encompassed the right to improve the right of way for its use as such.

It is for those reasons given above that I am not prepared to do away with the grant theory but only to give to the presumed grant as regards an easement for the transporation of irrigation water a different content than that with which such grant might have been invested by the English common law. Only to that extent am I prepared to go at this time. With apologies for this relevant intrusion, we resume the thread of the reasoning of this opinion.

From our interpretation of the common law of this state it follows that defendants' contention that plaintiff irrigation company may not waterproof its ditches and still retain its easement across defendants' land because the waterproofing would cut off the benefit to defendants of having their shrubbery nurtured by seepage water must be rejected.

Defendants' second contention is that plaintiff should not be allowed to improve the ditches in the manner it contemplates and started because the methods chosen would make the ditches more dangerous to children and therefore decrease the value of the land for residential purposes. This contention is in effect that plaintiff is attempting materially to change the burden or add additional burdens to defendants' land by its proposed use of its easement. The trial court found merit in this contention and in its decree, in effect, enjoins plaintiff from improving its ditches in the manner it proposed and retains jurisdiction to pass on the method for improvement before the plaintiff puts same into effect.

Plaintiff's cross-appeal of this part of the lower court's decree raises these questions:

1. Did the lower court err in determining the ditches if changed as plaintiff proposes would be "a seriously increased hazard to children"?

2. Did the lower court err in holding that for plaintiff to change its ditches as proposed would extend beyond the easement right of plaintiff?

3. Did the lower court err in using its equitable powers

in restraining plaintiff from proceeding to change its ditches?

4. Did the lower court err in retaining jurisdiction to pass upon the method of improving the ditches before plaintiff undertakes to improve?

An examination of the record shows the first question raised by the cross-appeal must be answered in the negative. The preponderance of the evidence on the point of what effect the proposed change of the ditches ■ will have on the hazard to children is clearly in support of the lower court's finding that to change as proposed would result in materially increasing said hazard.

Though the changing of the ditches as proposed would result in materially increasing the hazard and thus substantially depreciating the value of the servient estates would the proposed change if effected extend beyond the easement rights of the plaintiff? This is the second question raised by the cross-appeal. To determine this question we must determine exactly what is the extent of the easement plaintiff has across the servient estates in this case.

As stated previously in this opinion, the extent of an easement acquired by prescription is measured and limited by the use made during the prescriptive period. *Nielson* v. *Sandberg*, 105 Utah 93, 141 P. 2d 696; *Robins* v. *Roberts*, 80 Utah 409, 15 P. 2d 340; *Stephens Ranch & Live Stock Co.* v. *Union Pac. R. Co.*, 48 Utah 528, 161 P. 459; *Hannah* v. *Pogue*, 23 Cal. 2d 849, 147 P. 2d 572; 28 C. J. S., Easements, § 95C.

It is the application of the rule which gives rise to the practical difficulties. As stated in Tiffany on Real Property, Vol. 4, p. 588, § 1209:

"If it [the above announced rule] were applied with absolute strictness, the right acquired would frequently be of no utility whatsoever. A right of way, for instance, would, as has been judicially remarked (*Cowling* v. *Higgenson*, 4 Mees & W. 245), be available for use only by the people and the vehicles which have passed during the prescriptive period. But the rule is not applied with absolute strictness. 'As in the case of a grant the language is to be construed in the light of circumstances, so in the case of prescription the use is to be looked at in

the same way. The nature of the rights is not to be determined by the actual proved use alone, but by that in connection with the circumstances' (*Baldwin* v. *Boston & M. R. R.*, 181 Mass. 166, 63 N. E. 428)."

In the case at bar the purpose of the use during the prescriptive period was to convey water for irrigation across the defendants' lands. All parties—servient owners and those using the ditches—knew the purpose of the use. During the prescriptive period, as now, it was common knowledge that the only practicable way this arid country could be settled and the crops raised to support any substantial population was by using the mountain streams for irrigation purposes. It was common knowledge then, as now, that the extent of the settlement and development of this state depended upon the availability of water. It was known to the servient owners and to the water owners that the water available would have to be conserved. In fact, conservation methods were being applied during that prescriptive period and have been applied since the earliest days of settlement in these mountain valleys. The mere damming a stream and building a ditch to convey the water to irrigate crops is itself a water conservation measure as it makes available more water for constructive uses and decreases the waste of having the water flow unused to the lakes or ocean.

From these circumstances, as stated earlier in this opinion, the common law of Utah presumes that during the time of the creation of this easement all parties concerned knowing of the arid nature of this country, contemplated that at some future time the owner of the water would be required by law to prevent wastage of water, or, without coercion of law, would undertake to prevent waste as the need arose for more efficient use of the limited water available.

It follows that under the common law of this state and under the circumstances of the prescriptive user in this case the easement acquired by plaintiff was for the purpose of carrying irrigation water in ditches across the lands of defendants and included among other things the right, in the interests of water conserva-

tion, to improve the method of carrying said irrigation water and the right of entry to effect said improvements.

Though the right to improve the ditches in the interests of water conservation is within the easement the irrigation company has across defendants' land it does not follow the company can exercise that right in any manner it sees fit.

The rights of the dominant owner are limited by the rights of servient owner. *Pioneer Irrigation District* v. *Smith,* 48 Idaho 734, 285 P. 474. Each owner must exercise his rights so as not unreasonably to interfere with the other. In *Olcott* v. *Thompson,* 59 N. H. 154, 47 Am. Rep. 184, speaking of a prescriptive easement of an aqueduct privilege, the court said:

"There is no presumed grant of a right to exercise the easement in an unnecessary and unreasonable manner. The right of the easement owner and the right of the land-owner are not absolute, irrelative, and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both. The forms and materials of the reservoir cover and water pipes are restricted, not by those heretofore used, but by the reasonable necessity of the case. The substance of the easement is shown by the usage; but the form of the cover is a question of reasonable necessity. And in determining that question, the rights of the defendant, as the owner of the land, are to be considered, as well as the rights of the owners of the easement. He cannot compel them to adopt a form unreasonably inconvenient; and they cannot compel him to submit to the disfigurement of his grounds by a structure unreasonably unsightly and repulsive."

See *Bowman* v. *Bradley,* 127 Or. 45, 270 P. 919, and *Knudson* v. *Frost,* 56 Colo. 530, 139 P. 533. In *Jenkins* v. *Depoyster,* 299 Ky. 500, 186 S. W. 2d 14, 15, the court, speaking of the easement the mineral rights owner had over the surface said:

"The right to construct and operate proper and necessary facilities for transportation is a part of the severed property. There is, of course, the correlative right of the owner of the surface to use and deal with his estate in any legitimate manner not inconsistent with the rights acquired by the owner of the minerals. *The owners must have due regard for each other and should exercise that degree of care and*

*use which a just consideration for the rights of the other demands.*
* * *

*"It is elementary that the use of an easement must be as reasonable and as little burdensome to the servient estate as the nature of the easement and its purpose will permit."* (Italics added.)

The servient owner is the owner of the fee and as such has all the rights of an owner of the fee subject only to the reasonable use of the easement. *Nielson* v. *Sandberg,* 105 Utah 93, 141 P. 2d 696; *Olcott* v. *Thompson,* supra; *Dyer* v. *Compere,* 41 N. M. 716, 73 P. 2d 1356; *Pioneer Irr. District* v. *Smith,* supra, 48 Idaho 734, 285 P. at page 475; *Hotchkiss* v. *Young,* 42 Or. 446, 71 P. 324; 17 Am. Jur. 993, Easements, § 96.

Having decided that plaintiff's easement includes the right to improve the ditches in the interests of water conservation, it is apparent that so long as plaintiff carries out its rights to improve in a reasonable manner defendants have no legal grounds for complaint though the improvements result in decreasing the value of the servient estates. Neither would any reasonable improvements in the means of carrying the irrigation water be the substitution of a new and different servitude on the servient estate and so give rise to an action to enjoin the improvement or for damages for same because any reasonable improvement in the interests of water conservation is within the easement plaintiff acquired.

The additional burdens which the servient owner may enjoin or for which he may receive damages are those burdens over and above those embraced within the framework of the easement itself—not for additional burdens which may result from the easement owner exercising his right to make changes in his method of using the easement which right was included in the easement as originally acquired. Defendants have no legal grounds of complaint if additional burdens are cast on their estate by plaintiff's exercise of the right, included in its easement, to improve the ditches so long as that right is reasonably exercised.

What is a reasonable manner for the company to improve a particular ditch is a question of fact to be decided after considering location of the ditch, the type and use of the property through which it flows, the amount of water it carries, the relative cost of the possible methods of waterproofing and all other facts and circumstances bearing on the question. In *Jenkins* v. *Depoyster*, supra, the servient owner put a gate across a roadway necessarily used by the owner and operator of the mineral estate. The mine owner sought to enjoin the servient owner from maintaining the gate. The injunction was denied but the servient owner was ordered to move the gate back from the road 20 feet. The court in making its order considered the use of the land, the use of the roadway, the amount of interference with the easement owner, the expense of fencing the easement rather than maintaining the gate.

It may be the cheapest method for the company to improve its ditch would be an unreasonable method because it would unnecesarily injure the servient owner. It may be that the equities of the case require a slightly less efficient means of conservation in order to prevent unnecessary injury to the land owners. For example, in a narrow deep ditch less water would be lost due to evaporation than in a wider shallower ditch carrying the same amount of water; yet it may be that the damage to the servient owner from having a narrow, deep ditch over his property would be so much greater than from having a wider shallower ditch that it would be reasonable to allow only the less efficient improvement. On the other hand, the irrigation company should not be required to use a very expensive or unusual method merely because of a whim of the land owner or because the use of said method would be slightly less burdensome to the servient estate. The equities must be weighed. Each case must be decided on its own particular facts. In no case would the easement owner be allowed in improving his ditch to take more or different land from the servient estate than that used during the prescriptive period.

The servient owners cite cases to support their contention that the irrigation companies' easement does not include the right to waterproof and reshape its ditches in the interests of water conservation. Those cases decided in states where the need for water conservation does not exist or exists only to a limited degree are not controlling here as the common law of those states in reference to easements to course irrigation water is different from that of this state. In this class is *Allen* v. *San Jose Land & Water Co.*, 92 Cal. 138, 28 P. 215, 15 L. R. A. 93. The Utah cases cited, *Robins* v. *Roberts,* supra, and *Stephens Ranch & Live Stock Co.* v. *Union Pac. R. Co.*, supra, involve the taking of more land than was used during the prescriptive period and are not inconsistent with this opinion. The other Utah case, *Nielson* v. *Sandberg,* supra, involved pollution of water by the servient owner and is not inconsistent with this decision.

The lower court retained jurisdiction of the case to pass upon and approve the plan for improving the ditches before the irrigation company started said work. It is apparent the court retained that jurisdiction because of its following findings:

"VII * * * the easement right of plaintiff over, across and through the lands and premises of defendants as herein set forth was and is for the purpose of enabling plaintiff to construct, improve, maintain, and repair its said canals, ditches, laterals, dams, weirs and distribution system, and for the purpose of enabling plaintiff to transport, conserve, and convey its water through the same; each and all of which said rights were and are to be exercised at such time or times as plaintiff should determine, *except that improvements to said canals, ditches, laterals, weirs and distribution system may not be made more dangerous to children and others who may be on or who may go upon the premises of the defendants, and may not depreciate the use and value for residential purposes.*

"XII * * * if said canals or ditches or either of them are changed as proposed in plaintiff's amended complaint, then and in that case said lands of defendants will be reduced in value and will become less desirable for residential purposes if the canals or ditches are changed so as to become a menace to the lives and safety of children, *and in that event would extend beyond the easement rights of plaintiff;* that the changes prayed for in plaintiff's amended com-

plaint will not appreciably destroy the attractiveness of said premises if made and will constitute a seriously increased hazard, and that it is necessary for the court to retain jurisdiction to pass upon any plans for waterproofing to determine whether any substantially increased hazard will occur." (Italics added.)

From our exposition of the law of this case it is apparent the parts of the trial court's finding No. VII and XII, which are in italics, are erroneous. Plaintiff would not be exceeding its easement in improving its ditches provided the improvements are, under all the circumstances, ■ made in a reasonable manner and they do not cause unnecessary injury to the servient owners. The facts that the improvements would make the ditches more hazardous to children and would depreciate the value of the servient estates should be considered in determining the reasonableness of the improvements but it is incorrect to say the mere increasing of the hazard or depreciating of the value of the servient estates would be exceeding the extent of the easement rights in this case.

If the property owners had proved that the benefits to the irrigation company from changing the ditch would be so small in comparison to the damage to the servient owners that it would be manifestly unjust to allow the company to exercise what, under such circumstances, would be practically a bare legal right and by so doing inflict a great damage on the servient owners the court of equity could refuse to use its powers to aid such design. That the lower court did not think such was the case is evidenced by the court's judgment and decree which restrained the land owners from interfering with the company's improvement of the ditches and which left open only the method of making the changes. We share the opinion of the trial court that this case is one in which the balance of the equities in favor of the land owners were not so great as to preclude equitable assistance to the easement owner.

In the case at bar to support that part of the trial court's decree which has the effect of restraining the company from improving its ditches by the method it proposed, the

record must show that such method is, under all the circumstances, unreasonable in that it will unnecessarily damage the servient estates. The record of this case reveals that the proposed method will make the ditches more dangerous to children, that it will result in destroying some of the flora along the banks of the ditches, that the land will be depreciated for residential purposes. Have the servient owners shown the method proposed unreasonable in that it will cause unnecessary damage? We think not. If the method proposed were so unusual and so obviously unreasonable that it would be clearly apparent to the court merely from learning what the proposed method was that other methods must be practicably available to the irrigation company which would cause servient owners considerably less damage—in such case the enjoining of the method proposed would be proper without a showing by servient owners what the less damaging method or methods may be. The method of improving the ditch proposed by the irrigation company in this case is to reshape the ditches making them flat on the bottom and sloping on the sides at a 1 to 1 pitch and to line the ditches with rocks set in cement mortar. The method proposed is one which is widely used in this state and is certainly not an obviously unreasonable and unusual method for improving ditches. In the case at bar, for the servient owners to have shown the method proposed unreasonable because it would cause unnecessary damage they would have had to show that another method available for use would cause substantially less damage. This the owners have not done. As far as the record reveals, there is only one method of improvement practicably available to the irrigation company and that is the apparently reasonable method proposed by it. If other methods for waterproofing and shaping the ditches were practicably available to the irrigation company, which would effect the water conservation and would be materially less injurious to the servient estates, the servient owners should have revealed them. The trial court could then have enjoined the use of all methods except that one of those

practicably available to the company which would cause the least damage to the land owners and yet would substantially result in the desired water conservation. It can be argued that the court could take judicial notice that there are many different ways to waterproof and shape ditches. The court could take judicial notice that different methods of water-proofing and different shapes are used to improve ditches but it cannot take judicial notice that any method or methods other than that shown by the record are available to the irrigation company which would result in materially less damage to the servient owners than would be caused by the apparently reasonable method proposed.

Since the servient owners did not show that the method proposed by the irrigation company widely used for the purposes intended was in this instance unreasonable, the trial court erred in holding, in effect, such to be the case. Thus, the second question raised by the cross-appeal is answered in the affirmative.

As the facts do not support the trial court's holding that the company's proposal to improve its ditches in the manner stated would extend beyond its easement rights and said holding was therefore error, it follows that it was also error for the lower court, in effect, to restrain the company from improving its ditches as proposed and for said lower court to retain jurisdiction of the case in order to pass upon and approve the plan for improving said ditches before the plan was started to be put into effect. Thus, the third and fourth question raised by the cross-appeal must be answered in the affirmative.

This opinion is in nowise a determination that the method of improving its ditches proposed by the irrigation company is under all the circumstances of this case a reasonable method and that it will cause no unnecessary damage to the servient estates. Our holding is that the servant owners failed in the court below to prove such method is unreasonable and they therefore were not entitled to have the irrigation company restrained from putting that method into effect.

We pass now to the third contention made by defendants in the lower court and which is before us on this appeal. The record shows Oscar Moyle, one of the defendants, owns the right to use some water separate and apart from that which he owns as a stockholder in the plaintiff irrigation company. He is also shown to be tenant-in-common with the irrigation company in some of the ditches involved and has a right to bring this separately owned water to his land through said ditches. He contends that the waterproofing of the ditches across his land will make it impossible for him to use his separately owned water to keep alive the growth along the stream banks and thus one tenant-in-common, the plaintiff, would be ousting defendant Moyle from his enjoyment of the property owned by them in common.

The defendant correctly refers to the law of co-tenancy involved when he cites 28 C. J. S., Easements, § 95B, at page 778, which reads as follows:

"Where there are several owners in common of an easement, neither one can make any alterations which will render it less convenient and useful to any appreciable extent to any one of the others."

Moyle's right as a co-tenant with the irrigation company is limited to that of having the property owned in common continue to be convenient and useful to him. The property other than that on Moyle's land in which the co-tenancy exists is an easement to course water for irrigation purposes across land in ditches with the right to make improvements in the interest of water conservation and the irrigation fixtures placed on that land for the use of that easement. It is clear that Moyle's rights as a co-tenant would not be adversely affected by the irrigation company improving the ditches on the property of other persons. On the contrary, his rights as a co-tenant would be benefited because the easement owned in common would be improved and would be more convenient and useful for the purposes for which it exists, namely to course irrigation water across land.

That which Moyle and the irrigation company own in common on Moyle's land is the right of user of the irrigation ditch thereon to carry their water from the point or points it enters Moyle's property to the point or points where Moyle diverts his share for direct use on his land. Moyle and the company do not own in common any easement across Moyle's land because Moyle owns the fee and could not acquire and does not need an easement to convey water across his own land because that right accrues to him as the owner of the fee. The ditches involved were never intended to be used for direct irrigation of the land but were and are arteries to convey the water from its immediate source to the smaller ditches which are used and intended to be used to directly irrigate the land. The fact that water did seep from the ditches involved and so directly irrigated the land which formed the banks of said ditches was only incidental and resulted from using the ditches for the purpose for which they existed. If the ditches involved which are on Moyle's land are waterproofed so that the banks of said ditches are not directly irrigated, Moyle's rights as tenant-in-common with the company are not adversely affected. Quite to the contrary—his tenant-in-common interests will be improved and enlarged as the ditches will, if improved, more efficiently serve the purpose of their existence; that is, to convey water to the point or points where Moyle diverts it for use.

Moyle, the tenant-in-common, has never acquired by prescription or otherwise any right against his co-tenant to a previous ditch. Plaintiff's right to improve the ditches is not diminished or affected by the fact that Moyle is its co-tenant in some of said ditches.

The judgment and decree of the lower court is modified by striking therefrom the third to last paragraph which reads:

"The court shall retain a jurisdiction of this cause, however, to pass upon and approve the particular plan for constructing canals, laterals, ditches, dams, weirs, and other diversion works before commencement of the same by plaintiff.";

and by changing the second to last paragraph to read:

"It is further Ordered, Adjudged, and Decreed, that defendants, or either of them, or their servants, agents, or employees, are prohibited, restrained, and enjoined from interfering with the prosecution and completion of said work by plaintiff, its servants, agents, and employees."

The judgment and decree as modified is affirmed. Costs to respondent.

McDONOUGH, J., concurs.

LARSON, Chief Justice (concurring).

I concur in the order made, but I reach my conclusions by a less circuitous route. I think some of the bases upon which the prevailing opinion rests are rather unstable. I do not subscribe to the reasoning of the prevailing opinion as to the legal fiction which it assumes as a basis for its conclusions. The fiction set up by the old English common law of a lost grant as a ground for prescriptive rights, being without basis in fact and without necessity in law, should be utterly disregarded. It is as unreal and unsubstantial as the "will-o-the wisp",—an ignis fatuus. It is merely a legal tower of Babel, which leads to a confusion of tongues. Law should be more realistic—it should stand on its own feet, supported only by its necessity, its reasonableness, and its logic. Whatever may have the seeming necessity in the beginning for the fiction of assuming a grant, it no longer exists. The doctrine of prescriptive rights is firmly imbedded in our jurisprudence. In the trial court, the right is established upon the same theory, and by proof on the same lines and on the same order as in the title suits based upon adverse possession. The only apparent differences are in the element of time and payment of taxes. Even in adverse possession the payment of taxes is not necessary as no taxes were assessed against the property. Easement rights for water ditch are non-taxable in this state. The difference in time—seven years to acquire title and twenty to acquire

an easement—stands logically upon the difference in the nature and extent of the possession and use. In title cases founded on adverse possession there must be a complete and exclusive exercise of dominion by the claimant, or interloper, for seven years—which is deemed sufficient time to establish the adverse nature of the claim. However, in acquiring prescriptive easements, since the owner of the servient estates is only partially disposed—that is, there is only a limited interference with his property (the right of exclusive possession and use) a longer period is required to establish that the use or claim in the property is adverse and not permissive. All the elements involved and necessary to establish a prescriptive easement, are the elements of adverse possession. To say such rights are founded upon presumed grants is simply another illustration that "the voice is Jacob's voice, but the hand is the hand of Esau." I think therefore that in this day in our law, prescriptive rights are founded upon adverse possession and not upon presumed grants. *Harkness* v. *Woodmansee,* 7 Utah 227, 26 P. 291; *Yeager* v. *Woodruff,* 17 Utah 361, 53 P. 1045; *Coleman* v. *Hines,* 24 Utah 360, 67 P. 1122; *Morris* v. *Blunt,* 49 Utah 243, 161 P. 1127; *Bolton* v. *Murphy,* 41 Utah 591, 127 P. 335; *Farr* v. *Wheelwright Const. Co.,* 49 Utah 274, 163 P. 256.

Starting from the conception of the origin of an easement, I agree that the right of the dominant estate is broad enough to enable the owner to effectively utilize the right. As stated by Mr. Justice WOLFE this does not permit him to put added burdens on the servient estate, but the right to convey water through a ditch necessarily involves the right to maintain a ditch to convey the water. Since the water is the valuable thing, and its safe conveyance is the only reason for the ditch, it follows that a ditch may be maintained that will convey the water with a minimum of loss. If in maintaining the ditch or conveying its water the dominant estate puts an added burden upon the servient estate not within the nature and extent of the burden imposed by the easement as its existed—in other words if

the dominant estate seeks to enlarge its easement and thereby imposes greater burdens upon the servient estate, it must respond in damages to the servient estate for such added burden. I do not think we can say at this time that there would or would not be damage to the servient estate because that question is not here. The court did not award any damages and no question is raised as to that matter. On the record as it stands the writer is unable to see any damages, but the question not being here, I think we should not foreclose the issue. At this time we cannot tell what might be done in the future as to the ditch, nor as to increased burdens. That question should be left until it arises. By the same token I agree the trial court erred in holding the proposed improvement was a damage or increased burden which should be enjoined, and in retaining jurisdiction to pass upon the methods of leak proofing the ditch before improvements are undertaken. I agree that the servient estate has no right to have water seep from the ditch, and no right to prevent the dominant estate from leak proofing its ditch.

I therefore concur in the order made.

PRATT, Justice.

I concur. However, I am treating the discussion in the prevailing opinion pertaining to the question whether or not we should repudiate the common law theory of grant as the basis for the prescriptive right to an easement, as the personal views of the author of that opinion. Upon the merits of that question I do not care, at this time, to make any comment.

WADE, Justice.

I concur with the prevailing opinion of Mr. Justice WOLFE as to the question of the prescriptive easement on the following grounds only; I concur with his opinion on the other questions therein decided for the reasons therein stated.

In determining the nature of this prescriptive easement, its extent and limitations, the burdens and benefits which it confers upon each estate, we must look to the nature of the use which existed during the prescriptive period. Since the right has its inception in the use during that time, its extent and limitations, its burdens and benefits are determined by the nature of that use and the understandings of the parties thereto. Thus any use which would have probably been interrupted by the owner of the servient estate had the owner of the dominant estate attempted such use prior to the expiration of the prescriptive period, is a use which places a greater burden on the servient estate and therefore is beyond the prescriptive right acquired by the dominant estate. However, any use which the owner of the servient estate could during the prescriptive period reasonably anticipate would in the future be made of his property under such prescriptive use is not a greater burden on the servient estate. See Restatement of the Law of Property, Division V, Servitudes, §§ 477 to 480.

I concur with the result that Mr. Justice WOLFE reaches because I believe that the owner of the servient estate could, during the prescriptive period, reasonably anticipate that this ditch would in the future be improved and cemented as it is now proposed to do, and that regardless of this fact did not interfere with the use being made thereof. I believe that from the earliest time when irrigation ditches and canals were constructed it was understood that they were at first makeshift in their construction and would be improved later. By nature the longer a ditch or canal stands without breaking, the more impervious it becomes to seeping waters. It has been a universal custom in this state for irrigation and canal companies to make necessary improvements in their systems to prevent loss of water by seepage, particularly in places where the ground is especially porous. The history of irrigation in this state has been one of continuous improvement of systems, for that purpose, and that such improvements have been made, almost without objection on the part of the servient estates. It is only be-

cause I believe that such was the general understanding of all the parties concerned and that the proposed improvements could have reasonably been anticipated by the owners of the servient estates that I concur with the present result rather than adhere to the original opinion.