The ESTATE OF Paul STEED Through its administratrix Mary KAZAN, Plaintiff and Appellant,

v.

The NEW ESCALANTE IRRIGATION CO., Defendant and Appellee.

No. 890426.

Supreme Court of Utah.

Aug. 18, 1992.

Rehearing Denied March 4, 1993.

L.R. Gardiner, Richard Ruckenbrod, Salt Lake City, for Estate of Steed and Mary Kazan.

Edward W. Clyde, Steven E. Clyde, Salt Lake City, for New Escalante.

HOWE, Associate Chief Justice:

Plaintiff Mary Kazan, the administratrix for the Estate of Paul Steed (hereinafter Steed), sought a decree compelling defendant New Escalante Irrigation Company to replace the amount of runoff and seepage water that Steed lost when New Escalante changed its method of water application. The trial court declined to grant the decree, and Steed appeals. We are called upon to determine the law applicable when the use of new technology impacts long-established patterns of water use.

## I. FACTS

This case involves the use of water in Alvey Wash, which is south of the town of Escalante in Garfield County. The wash is shaped like a horseshoe opening to the south, with one prong of the wash coming from the southwest and the other prong going to the southeast. Escalante is located immediately north of the bend in the horseshoe. The inside of the southwest prong is bordered by tall and impenetrable

cliffs. The land inside the horseshoe slopes gently from the base of the east side of those cliffs across the middle of the horseshoe toward the east prong. A substantial part of that land has been irrigated for over one hundred years with water diverted from the Escalante River, which runs north of Escalante in a generally west to east direction, and with water taken from the southeast prong of the wash. The Escalante River is a tributary to the Colorado River. New Escalante's diversions are the last diversions from the Escalante River for irrigation in Utah. The unused water flows to Lake Powell on the Colorado River.

Alvey wash is a natural watershed, with a drainage area of about 102 square miles. It empties into the Escalante River about 25 miles downstream from the irrigated lands of Steed and New Escalante's shareholders. However, the Escalante River does not naturally contribute any water to Alvey Wash. New Escalante has historically delivered diverted water to the lands of its shareholders through open canals. The shareholders applied the water to their lands by flood-type irrigation. Some of their lands drain toward Alvey Wash, and consequently, runoff and seepage water reached the wash, where it commingled with the natural flow in the wash.

In 1982, New Escalante changed its irrigation system from flood irrigation to a pressurized sprinkler system of enclosed pipes. The open ditches and canals previously used were abandoned. The new system is much more efficient and has substantially diminished the runoff and seepage water which reaches Alvey Wash.

Steed owns a decreed water right in Alvey Wash from which it irrigates its lands. It contends that it had a vested right to receive the same amount of runoff and seepage flow to the wash. It characterizes itself as a downstream water user in the same river system affected by changes made by an upstream user. Steed sought an injunction, a replacement order, and money damages. The trial court held that

because there was no natural contribution of water from the Escalante River to the wash, Steed had acquired no vested right, either by appropriation, by adverse use, or otherwise, to compel New Escalante to continue to let the same amount of water run off or seep from the lands of its shareholders into the wash.

## II. VESTED RIGHT

Utah, along with the majority of western states, follows the appropriation doctrine: First in time, first in right for beneficial use is the basis of the acquisition of water rights. *Gunnison Irrigation Co. v. Gunnison Highland Canal Co.*, 52 Utah 347, 174 P. 852 (1918).

In a long line of cases dating from 1912, this court has dealt with the rights of water users in runoff and seepage water from higher ground. In *Garns v. Rollins*, 41 Utah 260, 125 P. 867 (1912), waste or percolating water from the irrigation of the plaintiff's land ran into a ditch from which the defendant irrigated his adjoining land. The plaintiff brought an action to determine the title and the right to use the runoff irrigation water. The trial court held that the plaintiff was entitled to as much of that water as she could put to beneficial use. On appeal, we reversed and held that the plaintiff had the absolute right to all of the waste water which she could capture before it ran off her land. We stated:

The law is well settled, in fact the authorities all agree, that one landowner receiving waste water which flows, seeps, or percolates from the land of another cannot acquire a prescriptive right to such water, nor any right (except by grant) to have the owner of the land from which he obtains the water continue the flow.

41 Utah at 272, 125 P. at 872. In *Garns*, we quoted approvingly the following statement from 1 Samuel C. Weil, *Water Rights in the Western States* 54 (3d ed. 1911): "Waste water soaking from the land of

another after irrigation need not be continued, and may be intercepted and taken by such original irrigator, and conducted elsewhere, though parties theretofore using the waste are deprived thereof." *Garns,* 41 Utah at 273, 125 P. at 872. Seven years later, in *Stookey v. Green,* 53 Utah 311, 178 P. 586 (1919), we cited *Garns* for the holding that "the run-off, waste, and seepage from irrigation are not subject to appropriation as against the owner of the land irrigated who desires to recapture it and apply it on his own land." 53 Utah at 319, 178 P. at 589.

The question as to what rights one can acquire in water that wastes or seeps from the land of another arose again in *Smithfield West Bench Irrigation Co. v. Union Central Life Insurance Co.,* 105 Utah 468, 142 P.2d 866 (1943). On the second appeal in that case, 113 Utah 356, 195 P.2d 249 (1948), this court gave a clear answer to that question:

> It is well established under the authorities cited in our previous opinion that waters diverted from a natural source, applied to irrigation and recaptured before they escape from the original appropriator's control, still belong to the original appropriator. If the original appropriator has a beneficial use for such waters he may again reuse them and no one can acquire a right superior to that of the original appropriator.

113 Utah at 363, 195 P.2d at 252–53.

Three years later, in *Lasson v. Seely,* 120 Utah 679, 238 P.2d 418 (1951), the plaintiff owned water rights in Panawats Slough, which was fed in part by runoff irrigation water from the defendant's higher land. Once again, following the precedent set in earlier cases, this court wrote:

> We therefore do not agree with plaintiff's contention that defendant or others using irrigation waters as upper appropriators cannot utilize water more efficiently in the future than in the past, if such future use would diminish the quantity of surplus or waste water which has heretofore found its way into the slough through surface drainage or by percolation. The plaintiff cannot compel defendant or others to waste water nor to forego a water turn to build up the flow of Panawats slough....

> ....

> The defendant is not precluded from changing the type or quantity of vegetation on his land, although by so doing less water may find its way into Panawats slough through percolation.... The decree of 1894 on which plaintiff relies, merely awarded the entire flow of Panawats slough to plaintiff's predecessor in title. It did not preclude more efficient use of the water by upper appropriator nor require upper appropriators to send any quantities of water into Panawats slough. The decree does not compel any upper appropriator to waste water nor to leave a surplus of water to drain into the slough. Nor could the decree direct the upper appropriators as to how they should utilize the water which they are entitled to use.

120 Utah at 689, 238 P.2d at 422–23.

One year later, in *McNaughton v. Eaton,* 121 Utah 394, 242 P.2d 570 (1952), this court addressed a dispute in which a natural wash was adjacent to irrigated land. Water accumulated in the wash from three sources: (1) natural waterways; (2) excess water diverted out of a nearby canal; and (3) waste water from irrigated lands on both sides of the wash. This court held that all three of these water sources were subject to reappropriation from the wash, but warned that the reappropriator acquired no rights as against the original appropriator to have the waste water continue to escape to the wash. We stated that the reappropriator of such water cannot require the first appropriator to continue to waste such water so that it will be available for use by the reappropriator. As long as the original appropriator has possession and control thereof, he may sell or transfer the right to the use of such waters to someone other than the reappropriator as long as he does so in good faith

and they are beneficially used, or he may recapture and use them for further beneficial use if he does so before they get beyond his property and control.

121 Utah at 403–04, 242 P.2d at 574.

In two later cases, we again recognized and restated the rule that an upstream irrigator had the right to completely consume all the water it diverted by using it over and over again. However, in each case we carved out an exception to the general rule specific to the fact situation before the court. In *East Bench Irrigation Co. v. Deseret Irrigation Co.*, 2 Utah 2d 170, 271 P.2d 449 (1954), we held that the rule did not apply when the runoff or waste water returned to the stream from which it was originally diverted. We quoted from Wells A. Hutchins, *Selected Problems in the Law of Water Rights in the West* 362–68 (1942):

> Appropriations may generally be made of waste water which has been abandoned by the original appropriators, but with important qualifications. Generally, an independent right to the use of abandoned or waste water can be acquired only if the water has not yet returned to the stream from which it was diverted. If such water after abandonment has re-entered a portion of the stream system from which it was originally appropriated, as noted in greater detail below, it becomes a part of that watercourse in legal contemplation as well as physically, and from the standpoint of rights of use, it is just as much a part of the flow as is the water with which it is mingled; hence appropriative rights which before the mingling have attached to the waters of the stream attach with equal effect to the waste waters originally diverted from the stream and then abandoned into it, so that an independent appropriation cannot then be made of the waste waters as such. . . .

2 Utah 2d at 181 n. 6, 271 P.2d at 457 n. 6. In some of the cases relied upon by Steed, the runoff or waste water did return to the stream from which it was diverted. *Piute*

*Reservoir & Irrigation Co. v. West Panguitch Irrigation & Reservoir Co.*, 12 Utah 2d 168, 364 P.2d 113 (1961); *Provo Bench Canal & Irrigation Co. v. Linke*, 5 Utah 2d 53, 296 P.2d 723 (1956); *East Bench Irrigation Co. v. Deseret Irrigation Co.*, 2 Utah 2d 170, 271 P.2d 449 (1954).

Another exception was recognized in *Stubbs v. Ercanbrack*, 13 Utah 2d 45, 368 P.2d 461 (1962). Once again, we acknowledged the rule in *Garns* that "water rights could not be acquired in waste water so that the defendant would be obliged to continue to irrigate his higher ground to provide water to be collected in the plaintiffs' drains." 13 Utah 2d at 50, 368 P.2d at 464. However, we held that that rule did not apply because after the irrigation water had been used, it commingled with the water in the natural water table, thereby losing its identity as irrigation water. As such, it could no longer be considered owned by the defendant. *Id.*

Turning to the present case, we agree with the trial court that the determination of this case is controlled by the rule we adopted in *Garns*, which we have consistently followed for the past eighty years. The trial court properly concluded that the water reaching Alvey Wash by way of seepage and runoff water from irrigation by New Escalante's shareholders was subject to reappropriation in 1909 when Steed's predecessor filed his application to appropriate water in Alvey Wash. However, such reappropriation did not carry with it any vested right to require New Escalante to continue to divert water from the Escalante River or to convey the water through its irrigation system and to restrict its use of the same so that the flow to Alvey Wash would be maintained at its historic level. Neither of the exceptions which we recognized in *East Bench* or in *Stubbs* is applicable in the instant case. In *East Bench*, the water had returned to the stream from which it had been diverted. In *Stubbs*, there was no attempt by the upper water user to capture surplus or waste water before it went into the ground.

There, the upper user let the excess water seep into the ground and then attempted to reuse it at the lower end of his land after it had commingled with natural water in the soil. No such fact situation is presented here.

Text writers on water law are in general agreement with our decisions in this area of the law. In the recent treatise *Waters and Water Rights*, it is stated that the only limitations which should compel an appropriator to continue wasting water are "(1) a finding that the amount released has been dedicated to the public and, therefore, the appropriator's water right has been modified to that extent; or (2) a cessation to purposefully harm the intervening user." 2 Robert E. Beck, et al., *Waters and Water Rights* § 13.04, at 150 (1991). That treatise further states that when water is applied to irrigation, there is

> an expectation that it is the water right holder's water and may be used by that owner to the fullest extent possible. Thus, the owner is allowed to "recapture" that water once it has been put to its ultimate use, whether in a sewage facility or on a field to irrigate a crop. The basic exception to allowing recapture is where the portion that would be subject to recapture has become return flow, that is, finds its way back to its source. At that point, if not before, it becomes tributary water and subject to the call of the stream.

*Id.* at 152–53 (citations omitted).

## III. BALANCE THE INTERESTS OF WATER USERS

■ Steed contends that regardless of whether it has a vested right, this court needs to balance the interests of upper and lower water users on the same river system. Steed asserts that New Escalante's change to the pressurized system has resulted in a 25 percent increase in efficiency and thus its shareholders now require about 25 percent less water to irrigate the same number of acres. Steed argues that allowing New Escalante to keep the excess water and expand the acreage watered by its shareholders ignores the loss of water to Steed. Steed concedes that increased efficiency in the use of water is desirable, but urges that out of the savings, losses caused to other users should be made up.

Moreover, Steed points out that there has actually been no increased efficiency. To the extent New Escalante now has water for more acreage, Steed has water for less acreage. Thus the basin as a whole has experienced no change. The technology employed by New Escalante has merely shifted water, giving the appearance of increasing efficiency without any real gain.

New Escalante counters that both the evidence and the trial court's findings are contrary to Steed's assertion that the change to the new system has resulted in substantial amounts of excess water. The evidence is to the effect that the pressurized sprinkler system is approximately 25 percent more efficient than flood-type irrigation. However, the new system does not make water. The system distributes an efficient application of the water, allowing the crops to consume more water. With a flood-type irrigation system, crops are somewhat over watered at the upper end and under watered at the lower end.

New Escalante's water right, with an 1875 priority, is for 40 cubic feet per second. The president of New Escalante testified that with the new system, the pipe capacity is 33 cubic feet per second (c.f.s.). The excess water is now stored in reservoirs and consumed in the late summer months when the flow of the Escalante River diminishes and New Escalante is unable to divert its entitlement of 40 c.f.s. He further testified that there is no water left at the end of the season. The trial court's finding on this matter is in accord with New Escalante. Moreover, New Escalante denied Steed's contention that an unauthorized expansion of acreage is being watered by its shareholders. Once again, neither the evidence nor the trial court's findings support Steed's contentions. At

the time of trial, New Escalante had the decreed right to irrigate 2,712.28 acres. The evidence indicates that it operated within that limit.

We must therefore reject Steed's suggestions as to how the interests of the two users can be balanced. Unfortunately, both parties cannot "win." The law simply favors the first user by allowing it to capture seepage and runoff before it escapes from the land. When there is not enough water to satisfy the needs of all users, the user who depends upon another's seepage and runoff will suffer.

Underlying Utah's water law is a strong policy to promote conservation. *American Fork Irrigation Co. v. Linke,* 121 Utah 90, 239 P.2d 188 (1951); *Little Cottonwood Water Co. v. Kimball,* 76 Utah 243, 289 P. 116 (1930). This can be done by encouraging the implementation of improvements in water systems to prevent seepage. In *Big Cottonwood Tanner Ditch Co. v. Moyle,* 109 Utah 213, 174 P.2d 148 (1946), we upheld the right of an irrigation company to cement and waterproof its ditches to prevent seepage even though it might harm trees, shrubs, and other plant life growing along the ditch banks on the servient property. We expressly rejected cases holding to the contrary because they were "decided in states where the need for water conservation does not exist or exists only to a limited degree...." 109 Utah at 235, 174 P.2d at 159.

In a concurring opinion in that case, Justice Wade wrote:

I believe that from the earliest time when irrigation ditches and canals were constructed it was understood that they were at first makeshift in their construction and would be improved later. By nature the longer a ditch or canal stands without breaking, the more impervious it becomes to seeping waters. It has been a universal custom in this state for irrigation and canal companies to make necessary improvements in their systems to prevent loss of water by seepage, particularly in places where the ground is espe-

cially porous. The history of irrigation in this state has been one of continuous improvement of systems....

109 Utah at 244, 174 P.2d at 164. The *Moyle* case is an example of where, in the interest of conservation, an irrigation company was allowed to capture its seepage even though the seepage was serving a beneficial use in supporting the flora along the ditch banks.

In the instant case, New Escalante has expended more than two million dollars to convert its system to a pressurized, enclosed pipe and sprinkler system. The open canals from which water once seeped are no longer used. Sprinklers apply the water to the land so that nearly all the water is absorbed and little runs off. If the water conserved could not be used by New Escalante, there would be no incentive to make improvements. So long as New Escalante diverts only that volume of water to which it is entitled, it should be allowed to make the most efficient use of it.

## IV. FAILURE TO FILE CHANGE APPLICATION

Lastly, Steed contends that before New Escalante changed from flood-type irrigation to the pressurized sprinkling method, it should have obtained approval of the state engineer to do so. Our statute that governed change applications when the action was filed read in pertinent part, "Any person entitled to the use of water may change the place of diversion or use and may use the water for other purposes than those for which it was originally appropriated, but no such change shall be made if it impairs any vested right without just compensation." Utah Code Ann. § 73–3–3 (1980). Steed concedes, however, that the failure of New Escalante to file a change application and obtain the approval thereof is relevant to this appeal only because it affects the allocation of the burden of proof. If New Escalante was required to obtain the approval of the state engineer to

make the change, the burden of proof that the change would not impair Steed's rights would be on New Escalante. *Piute Reservoir & Irrigation Co. v. West Panguitch Irrigation & Reservoir Co.*, 13 Utah 2d 6, 10, 367 P.2d 855, 858 (1962) (citations omitted).

New Escalante responds that it was not required to file a change application and obtain approval of the proposed change because it did not propose to change the place of diversion, place of use, or purpose of use as contemplated by section 73–3–3. New Escalante argues that both the former purpose of use and the new purpose of use are the same: irrigation. We need not and do not decide here whether approval of a change application was required. In view of the concession of Steed that only the burden of proof would be affected, there is no prejudice to Steed because it bears the burden of proof in this action.

As discussed earlier in this opinion, eighty years of unbroken case law support the right of New Escalante's shareholders to recapture waste and seepage water before it escapes their lands even though long-time users of the waste and seepage are deprived of the "second use." Clearly, no vested rights of Steed have been impaired by the change, irrespective of where the burden of proof lies.

### V. CONCLUSION

Because Utah is an arid state, efficient and beneficial use of water should be encouraged. In furtherance of that objective, an appropriator should be encouraged to apply water in the most efficient manner. Any technique which conserves water consumption and reduces waste is commendable. It is unfortunate that Steed lost some water which previously found its way to augment the water in Alvey Wash. However, absent a natural connection between the water in the wash and the water New Escalante diverted from the Escalante River, Steed acquired no vested right to compel New Escalante to allow the water

applied to irrigation to run off their shareholders' lands.

Significant amounts of irrigation water can be lost through evaporation, seepage, or other means. We must encourage greater efficiency through water-saving techniques. As former Chief Justice Crockett so appropriately noted in *Wayman v. Murray City Corp.* some 23 years ago: "Because of the vital importance of water ... both our statutory and decisional law have been fashioned in recognition of the desirability and of the necessity of insuring the highest possible development and of the most continuous beneficial use of all available water with as little waste as possible." 23 Utah 2d 97, 100, 458 P.2d 861, 863 (1969) (citations omitted).

Judgment affirmed.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.