King, J.,
delivered the opinion of the court.
John Wolff and Miers Fisher presented their joint petition under the provisions of the statute (session laws of 1903, p. 278 et seq., Rev. Stats, of 1908, sec. 3226 et seq.) praying for a decree permitting a change in the point of diversion of certain adjudicated water rights in water district No. 7, to-wit: seven second-feet of decreed priority No. 11, from the headgate of the Kershaw ditch, and five second-feet of decreed priority No. 16, from the headgate of the Fisher ditch, to the headgate of the Rocky Mountain ditch.. It was alleged that The Kershaw Ditch Company, a corporation, was the owner of the Kershaw ditch which was awarded sixteen second-feet of water 'by decree entered in 1884, and that petitioners were the owners, in severalty, of certain shares of the caiptal stock of said company, by reason of which the petitioner, Wolff, was entitled to the use "of two and one-half, and the petitioner, Fisher, to four and one-lialf second-feet of water so awarded; that Fisher was the owner of the Fisher ditch, which, under said adjudication, was awarded thirty-five cubic feet of water *573 per second, out of which he asked to change five second-feet. The Kershaw ditch had its headgate and was used to water lands on the north side of Clear Creek, and the Fisher ditch on the south side. The headgate of the Rocky Mountain ditch was on the south side of Clear Creek, about ten miles -further up the stream than the headgates of the ditches from which the water was to be removed, and distributed its water, generally, to another watershed. Of the protestants, The Farmers’ High Line Canal and Reservoir Company, a corporation, is the owner of the Farmers ’ High Line Canal, having its head-gate still further up the stream than the Rocky Mountain ditch, and the owner of priority No. 9 for 39.80 and priority No. 57 for 154 second-feet; The Colorado Agricultural Ditch Company, a corporation, is the owner of the Colorado Agricultural ditch, and The Lower Clear Creek Ditch Company, a corporation, the owner of the Clear Creek and Platte River ditch, both having large priorities junior to petitioners’, and taking their water from the north side of Clear Creek below the ditches of petitioners.
Protestants claim that all the waters of Clear Creek have been appropriated, and decrees rendered for many times the normal flow of the stream at ordinary stages, making it necessary to enforce the decrees each season, to supply the ditches in the order of seniority; that by reason of the location of petitioners’ headgates near the mouth of the stream, and the large area of irrigated lands further up the stream, the drainage of which is toward and into the natural stream above such headgates, the waters of said stream have been, and constantly are, augmented between the points at which the waters used by petitioners have been diverted, and the headgate of the Rocky Mountain ditch, at which they wish to divert twelve second-feet, to such an extent that much of the time the entire amount, and at all times a substantial *574 part, of the water used by petitioners has been supplied by such return waters, without requiring a demand for much, if any, of the natural flow as distinguished from said return waters; and further, that the ditches of petitioners and all the lands irrigated thereby lie near and sloping to the creek, so that all waste, seepage and surplus from irrigation, return quickly to the stream above the headgates of certain of the protestants ’ ditches; that these conditions have existed for forty years, and so existed at the times protestants made their appropriations junior to petitioners’; and, that a change of the point of diversion of twelve second-feet of water to a place ten miles further up the stream, and above these sources of supply by return waters, will require the withdrawal of that entire quantity a part of the time from the natural flow above the headgate of the Rocky Mountain ditch, which must necessarily be taken from the junior decree of the Farmers’ High Line Ditch and other ditches similarly situated, and will also detract, in a substantial measure, from the quantity which other ditches between the two places of diversion and below petitioners’ present diversion and use, have used and are entitled to receive. Other claims are made, such as loss of seepage from the amount sought to be changed, non-user, abandonment, enlarged use at the new point of use, that the former decree is void or excessive, from which injury is asserted; some of which will be considered. The petition was granted.
The testimony is voluminous, the taking thereof extending, intermittently, over a period of one year, and this, together with the law applicable thereto, was carefully considered by the trial court, and its findings of fact and conclusions of law made a part of the record. The court ruled that, inasmuch as the right to change the point of diversion of water-rights is a vested property right, it was not incumbent upon the petitioners to *575 prove that injury would not result to others by the change prayed for, in order to establish a prima facie case, but, that the burden was on respondents to prove injury to their vested rights; and further, that respondents were bound to show, not only that the injury claimed was to a vested right held by them, but that the vested right so injured was equivalent in proportions, as well as character, to that of petitioners, and of a fixed or determinate quantity, so that the court could impose terms to prevent the injury, as provided by statute; or, if impossible to fix terms and conditions by which the injurious effect could be prevented, or the parties affected be protected, deny the application in toto; and also held that the vested rights presented by respondents for the consideration of the court as injuriously affected, were seepage rights, pure and simple.
The process of reasoning by which a court reaches its conclusion is of slight consequence if the correct conclusion is reached. But as we do not agree with the conclusion of the trial court, we deem it proper to note the foregoing statements and conclusions, because we think they are responsible for the court’s ultimate finding that injury would -not result from the change granted.
The only issue raised and supported by the evidence necessary to consider here is as to the quantity of return waters, and its effect upon the conditions that will be disturbed by the change. The evidence as. to the augmentation of the stream by return waters is conflicting as .to quantity only. Nearly all the testimony on that subject was from the witnesses offered by respondents, and, being decisive of the case, will be noticed somewhat in detail. Ralston Creek is a tributary of Clear Creek and enters that stream between the old point and the new point of diversion; but there is no evidence that it increases the supply of the stream except as it gathers return or flood waters. Several engineers whose quali *576 fications were admitted testified. Thomas Grieve, civil engineer and hydrographer in the office of the state engineer, took observations and measurements from the head of the stream to a point below petitioners’ ditches, from which he found a total gain of 11.9 second-feet, which he designated as seepage. Charles W. Beach, deputy state engineer, took observations and measurements for several days for the purpose of ascertaining the amount of the return waters, from which he computed a gain from seepage, between the Rocky Mountain ditch and a point just below petitioners’ ditches, of 13.72 second-feet. The difference between the estimates of these two engineers may be accounted for by the different times in the year when the observations were made. This witness made an excellent statement of the reason why injury will result from the proposed change, when he said: “The change would move the point of diversion above some of the sources of supply. The removal up the stream would be a tax on the junior decrees further up.” C. C. Schrontz, a civil engineer, an employee in that capacity of a reservoir company, took observations extending over a long period of time for the purpose of ascertaining and advising his company whether surplus waters from this stream could be found in sufficient quantity to justify the construction of reservoirs for storage for irrigation purposes. His computations and estimates were made from his own observations and measurements, coupled with reports of the state engineer, and measurements of the stream covering a period of years, made by employees of the government. His testimony is that, while during the time of his examination, but 73,000 acre feet of water came into the district, 96,000 acre feet were actually distributed by the ditches and used, from which he concludes that the difference — approximating 23,000 acre feet — arises from seepage waters, practically all of which would como into the stream, or ditches, below the *577 lieadgate of the Rocky Mountain ditch. Two acre feet are shown to be sufficient, generally, to irrigate one acre of land. Consequently the return waters which this engineer found, would, with economical use, irrigate. 11,000 acres of land. It is equivalent to one billion cubic feet * of water.
Certain water commissioners and others whose observations and experience qualified them to testify intelligently as to the facts, estimated the seepage (which word is used by all the witnesses to include all return waters) at from ten to fifty second-feet during the irrigation season, the higher amount being in flood season, the estimates being an average of twenty or more second-feet during the entire irrigation season. One of these witnesses testified that when but forty second-feet of the natural flow was passing the lieadgate of the Rocky Mountain ditch, all the ditches below that point were fully supplied, the quantity used being many times forty second-feet.
If the testimony of the foregoing witnesses be accepted as substantially correct, there can be no other conclusion than that at practically all times during the irrigation season, not only the petitioners’ ditches, but*all ditches between the two points of diversion, can be and have been supplied in a large measure by return waters which there make up the body of the stream; and therefore, the change in point of diversion must necessarily injure the ditches further up the stream to the full extent of the amount changed during a considerable portion of the irrigation season. The clear preponderance of the evidence sustains this view.
Counsel for appellees contend that there is a conflict in the evidence, and, therefore, the findings of the trial court should be regarded as conclusive upon this court. That such rule applies to this proceeding is settled in Wadsworth D. Co. v. Brown, 39 Colo., 57. And upon a *578 number of matters that were litigated, upon which extended evidence was taken, the rule is applicable and accepted as conclusive in this case. But upon the question of augmentation of the stream by return waters between the two points of diversion, there is no substantial conflict in the evidence. This case comes within and is controlled by the reasoning as well as the ruling of the supreme court in Bates v. Hall, 44 Colo., 360, and Vogel et al. v. Minnesota Canal Co., 41 Colo., 534, in which it was said that from the conditions there existing, injury to junior appropriators would necessarily result.
As against the change sought by petitioners, the junior appropriators had a vested right in the continuance of the conditions that existed on the stream at and subsequent to the time they made their appropriations, unless the change can be made without injury to such right.—Vogel et al. v. Minnesota Canal Co., supra. That right is a “vested right” which respondents contend will by the change be disturbed to their injury. As applied to The Farmers’ High Line Canal Company, the right affected is in no sense a seepage right, as held by the court. Its junior decreed right, which is supplied by natural flow only, will beJ depleted to supply the loss caused by-moving the point of diversion. Where the right to change the point of diversion exists, it is a property right, incident to the water-right itself; but it is a conditional right (therefore doubtful and questionable), and does not exist at all, as an incident or otherwise, unless it can be exercised without injury to other vested rights; nor can it be exercised until permission has been obtained in a proceeding of this character.—Fort Lyon Canal Co. v. Chew, 33 Colo., 392, 402. Therefore, one who asserts the right to a change in the place of diversion has the burden of proving that the change will not injuriously affect the vested rights of others, although this may involve the proof of a negative.—Irrigation Co. v. Water *579 Supply & Storage Co., 49 Colo., 1; Vogel et al. v. Minnesota Canal Co., supra. If the trial court had correctly placed the burden of proving injury upon the respondents, nevertheless, it was not necessary that injury to their vested rights, equal in proportion to the right sought to be changed, be shown. It is sufficient if the injury be substantial. The maxim de minimis non curat lex is applicable, but beyond proof of substantial injury, the quantum or character thereof appear to be material only for the purpose of ascertaining whether, and in what manner, the injury may be prevented or the injured party protected. See Hallet v. Carpenter et al., 37 Colo., 30, and Wadsworth D. Co. v. Brown, supra.
A large volume of the evidence' introduced by respondents was offered for the purpose of showing nonuser of the water by plaintiffs, resulting in abandonment of alleged water-rights evidenced by the decree of 1884, and much of the argument of counsel is addressed to the question of abandonment. For such purpose the. evidence was not admissible.—Lower Latham D. Co. v. Bijou Irr. Co., 41 Colo., 213; Wadsworth D. Co. v. Brown, supra. In our opinion it was an unfortunate day for the public welfare, and for the owners of legitimate water-rights based upon actual appropriation, when the supreme court felt compelled to rule that abandonment could not be made an issue in this special statutory proceeding for a change in the point of, diversion. There is no time so opportune, and no other proceeding so appropriate for trying that issue, as when, under a petition of this nature, all the ditches, owners and claimants of water-rights, are in court; and the decrees, the use of water, the conditions on the stream, the quantity of return waters, the quantity of an entire decreed appropriation to a ditch whether owned in severalty or as tenants in common by individuals, or by a corporation, to which the person seeking the change is entitled, are before the *580 court fox consideration and determination. That rule has become the excuse for many actions ostensibly to change the point of diversion of waters appropriated, while the real purpose and effect is to revive or give life to and make effective a mere paper appropriation of water that has never been applied to a beneficial use by the claimants, and to encourage speculation in such excess decrees masquerading under the name of “water-rights,” and resulting in serious and irreparable loss to bona fide appropriators. It puts a premium on “watered stock” in the irrigation system, that deals with and controls the most important element in the growth of agricultural and horticultural products in this arid region, viz., water. However justifiable, or even necessary, the ruling may have been, its effect has been- vicious. When once the change has been granted, there is no proceeding yet discovered that affords appropriate relief, within the reach of a claimant with limited means. It has not been explained and we do not know how abandonment can be predicated of a water-right that, although having lain dormant for many years has been given life and strength and value by decree granting its use at a new point of diversion. We give reluctant obedience to the rule, but suggest that the law be amended by appropriate legislation, to admit this and other issues, such as enlarged use, now excluded. The danger of loss to junior appropriators arising from the law so established has been lessened by the beneficent, flexible and far-reaching rule announced in Vogel et al. v. Minnesota Canal Co., supra, that a junior appropriator of water to a beneficial use has a vested right, as against his senior, in a continuation of the conditions prevailing on the stream, surrounding the general method of the use of water therefrom, as they existed at the time he made his appropriation, without substantial change, unless it appear that a proposed change will not work harm to his vested rights. *581 It may be further- mitigated by a strict adherence to the rule that the burden of showing that injury will not result is upon the person seeking judicial authority for the change. It is a matter of common knowledge that, except on streams in which the appropriations have not exceeded the constant supply, few instances arise in which the change of place of diversion of large quantities of water, for a long distance, can be made without substantial injury to juniors, and the utmost care and scrutiny to guard against such injury.
But in the instant case the trial court admitted such evidence, not for the purpose of showing abandonment, but for what it might be worth as tending to prove other material issues. We think the size and capacity of the ditches, the quantity of water used, as measured by time as well as by volume, the place where and the acreage upon which the same was used, the periods of non-user between successive irrigations of the land, and excessive use, and the place and conditions of contemplated use after change is made, all have a direct and important bearing on the question of injurious effect that may follow a change in the conditions existing at the time of the junior appropriation; and therefore, while inadmissible for some purposes, such evidence was admissible for others.
Appellants contend that the provisions of this special statute, relative to service of process, are unconstitutional in this, that they violate the constitutional requirement that all proceedings in courts of justice shall be uniform, and that they deprive interested parties of their property without due process of law. We think this contention is not tenable. The act of 1903, under which this proceeding was brought, is entitled ‘ ‘ An Act in Relation to the Procedure in Changing the Point of Diversion of the Right to Use Water from the Streams of the State.” By the session laws of 1905, p. 244 (Rev. Stats. ’08, sec. *582 3289, Mills’ Ann. Stats., 1912 ed., sec. 3812), the provisions of the act of 1903 relative to service of process were amended. These two acts in themselves, and by reference to the general irrigation statutes, provide a complete code of procedure for obtaining jurisdiction in this class of cases.
The irrigation acts of 1879 and 1881 were intended as a system of procedure for determining the priority of rights to the use of water for irrigation. ' The proceedings under said acts are purely statutory.—Platte Water Co. v. Northern Colo. Irr. Co., 12 Colo., 525, 529. In Louden Canal Co. v. Handy Ditch Co., 22 Colo., 102, 111, it is said of these statutes: ‘ ‘ The two together constitute a complete system of procedure that, in operation, has been found so salutary and free from- unnecessary expense as to command the tacit endorsement of all subsequent legislatures.” This statutory proceeding is not an ordinary civil action or proceeding, but a proceeding sui generis, to which the rules covering ordinary civil actions are not always applicable.—Irrigation Co. v. Downer, 19 Colo., 595. They are in the nature of police regulations to secure the orderly distribution of water for irrigation purposes.—F. H. L. C. & R. Co. v. Southworth, 13 Colo., 111, 134; Combs v. Farmers’ H. L. C. & R. Co., 38 Colo., 420, 428; Broad Run Co. v. Deuel Co., 47 Colo., 573, 579; Irrigation_ Co. v. Water Supply & Storage Co., 29 Colo., 469, 475. These proceedings are also said to be analogous to actions to quiet title (Crippen v. X. Y. Irrigating D. Co., 32 Colo., 447, 457), and in the nature of actions in rem.— Broad Run Co. v. Deuel Co., supra. In the Louden Canal Company case, supra, the supreme court, by Mr. Justice ITayt, said: “Early in the history of the state the legislature, finding the ordinary processes of the law and the actions then known to the courts too expensive and also inadequate to meet the novel conditions incident to the appropriation of water for the purposes of irrigation, *583 enacted what is known as the ‘Irrigation Statute of 1879.’ * * * The main features of this act have withstood the test of experience and criticism and are still the law of this state.”
From the foregoing it will appear that the general adjudication statutes, of which the act providing proceedings for change of the point of diversion has become a part, have been upheld by the highest court of this state against every attack. The first statutory provision providing a procedure for changing the point of diversion was the act of 1899.' — Session Laws of 1899, p. 235. This was held valid as a remedial statute and as a rightful exercise of the police power of the state, and as providing an exclusive remedy, in Irrigation Co. v. Water Supply & Storage Co., supra. And later, in Fort Lyon Canal Co. v. Chew, supra, it was said that the right to change the point of diversion cannot he exercised at all until after a decree therefor has been obtained under the statutory proceeding.
The acts of 1903 and 1905 hereinbefore referred to, amendatory of or supplementary to the act of 1899, as to the practice and procedure, including method of service, are sustained for the reasons hereinbefore given for sustaining the general irrigation statutes and the said act of .1899, as a valid exercise of legislative powers.
Counsel for appellants contend that under the act of 1905 no one is required to he served at all unless the court so orders upon good cause shown. This contention is not sustained by the language of the act. It is provided that no further publication or posting of the notice required in original adjudication proceedings, or any notice of individual subsequent proceedings, shall be required, unless by order of court upon good cause shown. But, as we read the statute, in case of a hearing upon petition for transfer of a water right, the notice of such hearing-must he served not less than fifteen days prior to the date *584 of tlie hearing, in the manner provided by law for service' of summons in other civil actions; and, in addition thereto, the court, upon good cause shown, may require publication or posting of the notice as in original adjudications, unless the petitioner shall elect to proceed under the statute in force at and prior to the time of the passage of the act of. 1905, in case of which election, service of notice, in order to be good, must in all respects comply with the provisions of such statute. The case of Bear Lake Co. v. Budge, District Judge, 75 Pac., 614, 617, 618, upon which appellants rely to support their contention that the foregoing provisions are unconstitutional, although strong and conclusive in its reasoning upon the statute of the state of Idaho, is not in point, and therefore not conclusive, nor particularly persuasive under the statute now being considered. The Idaho statute provided for an adjudication instituted in the name of a water commissioner, and for constructive service of summons by publication only, under which the supreme court of that state, in the case cited, held that the law violated the provisions of the federal constitution and the state constitution prohibiting the taking of property without due process of law, and also the provisions of the state constitution which require all laws relating to courts to be general and of uniform application, and the proceedings and practices of courts to be uniform. Our statute provides for personal service where such service can be made, and constructive service as in other civil cases such as suits -to quiet title or proceedings in rem, where personal service cannot be made.
It is also objected that proper service and proof of service were not made. Upon the petition’s being filed, the court ordered notice to be published for four successive weeks in three newspapers — one in each county into which water district No. 7 extended — and that service of said notice and proof thereof be furnished to the court *585 as required by law in such cases. Publication of the notice was made and due proof submitted, in addition to which copies of the order and notice were personally served upon a large number of individuals and corporations, and proof thereof made by the affidavit of a person certified by the clerk of the court to be a credible and reliable person; and in addition to giving the persons named as served, the affidavit stated generally that the notice was served “on the owners and claimants of all the ditches taking water out of the public streams ’ ’ in water district No. 7 for irrigation, as shown by the statement on file and the decree entered in this cause in October, 1884, and also that ten copies of said notice were posted in ten public places in said water district, stating the places at which said notices were posted, including one copy at the post-office and one at the court house in the City and County of Denver. The court, in its findings and decree, recited that due service of said notice had been made on all persons who may be affected by the change. During the progress of the hearing it was shown that the Kershaw Ditch Company had not been made a party to, nor notified of the proceedings, and that certain persons residing in the water district having interests in the Kershaw ditch and its water rights adverse to the petitioners’ and to the Kershaw Ditch Company, had not been served with notice. Thereupon counsel for petitioners entered appearance for The Kershaw Ditch Company and on behalf of said company consented to the change prayed for. The evidence showed that prior thereto these parties had secured a decree adjudging such parties to be the owners of several interests in the Kershaw ditch, and in its water rights, amounting in all to about 110 statutory inches, from which judgment an appeal had been taken at that time, but which has since been affirmed by the supreme court.—Wolff v. Pomponia, 52 Colo., 109, 120 Pac., 142. It is contended by appellees that The Kershaw Ditch *586 Company, a corporation, represented all the consumers of water under said ditch, and therefore, that its appearance constituted an appearance for these other parties. But it is clear that the ditch company did not, as alleged in its petition, own the entire ditch, nor represent the interests of these claimants, but such parties were adverse in interest. And it is equally clear that they were not only proper but indispensable parties to this proceeding, and that no judgment binding upon them could be entered herein in the absence of notice or appearance, or waiver of such notice, or consent to the decree. They were entitled to personal service, and the published notice was not, as to them, sufficient.
It is contended that two copies of the notice posted by appellees were posted outside the irrigation district and that therefore such service was void. In this respect we agree^ with appellants; but such posting was in excess of the requirements of the provisions of the act of 1905, was unnecessary, and void service in that respect is immaterial. In Irrigation Co. v. Water Supply & Storage Co., supra, it is held that the interests of the state are .involved in this proceeding, and its rights should be protected, and that the courts must enforce the statute, and “sua sponte require all persons who may be affected by the desired change to be notified of the proceeding and given an opportunity to be heard.” For want of proper service the judgment cannot be sustained.
Upon the views expressed it is apparent that the judgment appealed from must be reversed and the cause remanded, with directions to deny the petition unless it be shown that terms may be imposed upon which the change in point of diversion may be granted. As to whether such terms may be ascertained and imposed we express no opinion. If further hearing upon the petition is had, after due notice to the parties not heretofore *587 brought into court in this proceeding, the evidence heretofore taken may be considered together with such other evidence as may be offered.
Decided March 13, A. D. 1913.
Eehearing denied April 14, A. D. 1913.

Reversed and Remanded.