271 P.2d 449

**EAST BENCH IRR. CO. et al.**

v.

**DESERET IRR. CO. et al.**

No. 7990.

Supreme Court of Utah.

May 28, 1954.

E. R. Callister, Jr., Atty. Gen., Robert B. Porter and John W. Horlsey, Salt Lake City, Nephi J. Bates, Richfield, Dudley Crafts, Delta, Sam Cline, Milford, Ferdinand Erickson, Richfield, Marr, Wilkins & Cannon, Richard H. Nebeker, Salt Lake City, for appellant.

Wilford M. Burton, and Paul Reimann, Salt Lake City, for respondent.

WADE, Justice.

What vested rights do the lower water users of a river system have which may not be impaired under section 73-3-3, U.C.A.1953,[1] by a change in the place of diversion or place or nature of use by the higher users of the waters of such system? This is the main question presented by this appeal.

Plaintiffs, respondents here, consist of 23 different water users on the south fork of the Sevier River. Each of them is an individual, association or corporation which owns or operates an irrigation canal system which diverts and uses water from such river system above the Kingston measuring station, located just above the Piute reservoir. Most of these waters are used in Circle and Panguitch Valleys high in the mountain head-waters of that river system and all of them are used between the Kingston measuring station and the Hatch Town Damsite, a distance of about 42 miles. Circle and Panguitch Valleys in places are about 5 miles wide and near the river the lands are somewhat flat and marshy so that in places cattails grow but most of such lands grow native meadow grasses.

Each plaintiff filed an application in the Office of the State Engineer for a change in place of diversion and use of its waters. They propose to jointly construct a dam at the Hatch Town Damsite to store about 13,650 acre feet of their fall, winter and early spring waters for use on their lands in the late summer months. Also, three of the plaintiffs propose to irrigate 5,000 acres of new lands which they own on the east side of Panguitch valley between one and a half and three miles from the river and beyond the lands now irrigated.

During 1906 to 1909 the state constructed a reservoir at the Hatch Town Damsite together with the Old State Ditch to store and convey water for the irrigation of these new lands. The state contracted to sell such lands to new settlers who occupied, cultivated and irrigated them but in May, 1914, the dam washed out and has

1. That section says: "Any person entitled to the use of water may change the place of diversion or use and may use the water for other purposes than those for which it was originally appropriated, but no such change shall be made if it impairs any vested right without just compensation. * * *"

not been replaced, the settlers abandoned the land which reverted to the state and since then has grown only sage brush and wild grass without irrigation. Plaintiffs claim no right to store and use water on these lands because water was previously stored and used to irrigate them. They only claim the right to change the diversion from the head of their canals to this reservoir and the head of the Old State Ditch, and to change the use of this water which has in the past only been used as a direct flow right onto their lands to a right of storage in the reservoir and later use on the lands where they have been previously used and also to use them to irrigate these 5,000 additional acres of new lands.

In 1936 the Cox Decree made a general adjudication of all the rights to the use of the waters of this river system. It awarded to plaintiffs when available the right to use 74 cubic feet of water per second from November 1st to March 31st and 337.86 second feet from April 1st to October 31st. By their applications plaintiffs claim only the right to irrigate about 14,000 acres but their evidence tends to show that they irrigate about 24,000 acres, about 10,000 acres of which is water-logged meadow lands. They claim the right to use the full quantity of water awarded to them during all seasons of the year for storage in the reservoir to be constructed, for irrigation of their lands which are presently irrigated and for irrigation of the new lands, as they see fit, even though such use decreases the quantity of water now available for the use of the lower water users. But even if by these changes they may not decrease the quantity of water available for the lower users they claim and their evidence tends to show that they can save sufficient water by use of the reservoir and lowering the water table in the meadow lands so that the lower water users will receive fully as much water if not more than they would under the present system.

The defendants, appellants here, are all of the water users on the Sevier river system below the Kingston measuring station. On their protest, the State Engineer rejected all of the applications because he found that their approval would enlarge the plaintiffs' rights, adversely affect defendants' existing rights and make an impossible distribution problem. Plaintiffs appealed from that decision by bringing these actions in the district court. The cases were consolidated for trial and the court reversed the Engineer's decision, approving the applications on condition that during the period from November 15th to March 15th any applicant storing water in the reservoir shall not at the same time divert water into his canal, that during the period from March 16th to November 14th the yield of the river at Kingston Measuring Station shall be maintained as it would have been under similar periods of time in previous similar years, that computation of the water to be delivered at Kingston shall be made in periods from March 16th to

June 15th, from June 16th to September 15th and from September 16th to November 14th, and that the plaintiffs and not the State Engineer and the water commissioners shall have the responsibility of seeing that defendants get their full water rights at Kingston. Defendants appeal from this decision.

The head waters of the south fork of the Sevier River travel about 225 miles. It is the longest river system completely within this state. The south fork begins in the high mountains on the north side of Kane County near the southern boundary of the state and flows slightly east of north surrounded by valleys and canyons between high mountain ranges through Garfield, Piute and Sevier counties. It then circles toward the west through the southwest corner of San Pete County where it emerges out of the mountainous country into the Sevier Desert and into Juab County near the Sevier Bridge Reservoir. From there it continues circling toward the west through the southeast corner of Juab County into Millard County, flowing in a southwesterly direction until it is completely consumed by storage reservoirs and irrigation about 75 miles below the River Bridge Reservoir and before it reaches Sevier Lake where it used to empty. Since 1916 when the last enlargement of the Sevier Bridge Reservoir was completed, except for the years of 1922, 1942 and 1946, all of the waters yielded by this river system have been used except the holdover waters in the reservoirs. Only a small amount was turned loose in 1922 and 1942 and about 23,000 acre feet in 1946. About 10,000 acre feet of that was used for early irrigation and the rest was not used. This was brought about because the United States created a farm project for displaced Japanese at Abraham and purchased 20,000 acre feet of water in the Sevier Bridge Reservoir which it failed to use but stored and allowed to accumulate in the reservoir from year to year until in 1946 an early heavy runoff of water under those conditions filled the reservoir, thus necessitating the loss of this water.

From Panguitch Valley to Sevier Lake there are thousands of acres of land suitable for cultivation and irrigable from this river, which are uncultivated because of the scarcity of water. In the Sevier Desert only a small portion of the lands suitable for cultivation which could be irrigated from this river system if there were enough water are now cultivated and irrigated and there are many thousands of acres which were once cultivated and irrigated from this system which have been abandoned and reclaimed by the desert because of the scarcity of water. This is different from the situation in most streams of this state where there is usually a substantial spring runoff. If this change has the effect of cutting off a part of the supply of water now available for the use of the lower water users it will mean that more cultivated land will be reclaimed by the desert.

Above the Sevier Bridge Reservoir the canyon walls and the valleys slope from the mountain ranges on each side toward the river and all the water which falls within this river's water shed and the waters which are applied on the lands on both sides quickly find their way back to the river, either by direct surface streams or underground seepage. Thus much of the water of this river system is used over and over for irrigation. There are many tight dams along the river which divert the entire flow but in a short distance water rises in the river bed and soon the stream develops into substantial proportions. Below the Sevier Bridge Reservoir after the water is used to irrigate land it is drained either back into the river or onto lower lands and used over again until it is completely consumed. So if this change deprives the lower users of the use of any water which they would have had if the change were not made it will directly deprive lower water users of the use of vitally needed water.

There are many storage reservoirs in this river and its tributaries but none of them store the waters of the south fork above Kingston. The Sevier Bridge Reservoir is the largest and the Piute Reservoir next. The river flows about a hundred miles between them at first through canyons and then through the fertile long Sevier Valley. The Sevier Bridge Reservoir has a storage capacity of 235,962 acre feet. It was commenced in 1902, and began storing up to the 60 foot level in 1912, and finally completed to the 90 foot level in 1916; it supplies water to reclaim 70,000 acres of land. The Piute Reservoir was commenced in 1906, began storage in 1910 and completed in 1912 with a storage capacity of 84,000 acre feet but is only used to store 74,000 acre feet. The capacity of these reservoirs is much more than the average amount of water available for storage each year. But it is necessary to keep holdover water stored from the wet years available to use during the dry years. There are about 70 measuring stations established on this river system; the most important to this case are the ones at Kingston and Hatch. Quite complete records are available for a long period of the flow of the river and its tributaries, and of the snow and rain fall at the various places within this water shed.

The general question posed at the beginning of this opinion and others incidental thereto will be considered in the order stated under the following questions: 1. Is there reason to believe that the proposed changes can be made without impairing the vested rights of lower water users?[2]

2. See United States v. District Court, Utah, 238 P.2d 1132; Id., 242 P.2d 774; In re Application 7600 to Appropriate 30 Second Feet of Water, 63 Utah 311, 225 P. 605; Eardley v. Terry, 94 Utah 367, 77 P.2d 362; Tanner v. Bacon, 103 Utah 494, 136 P.2d 957; Whitmore v. Murray City, 107 Utah 445, 154 P.2d 748; Little Cottonwood Water Co. v. Kimbril, 76 Utah 243, 289 P. 116; Lehi Irr. Co. v. Jones, 115 Utah 136, 202 P.2d 892.

2. What vested right do the lower users have? 3. Will the proposed changes create an impossible administrative problem? 4. Should the responsibility of administering this water under the change be shifted from the State Engineer and the water commissioners to plaintiffs?

1. There is reason to believe that the proposed changes can be made without impairing vested rights of lower water users. From the testimony of plaintiffs' irrigation experts there is reason to believe that by storing water, which they now divert and consume on their lands, in the fall, winter and early spring in the proposed reservoir and by draining the water table of their meadow lands to a much lower level, a saving of at least 15,000 acre feet of consumed water can be effected. There is much evidence that these lands are flooded many times when water is plentiful in order to store it in the ground for the dry season, that this is a beneficial use where there is no reservoir storage available but is very wasteful as compared with reservoir storage and later irrigation. Even defendants' experts do not dispute these principles but they contend that plaintiffs have not and do not now propose to drain the water table of their meadow lands to a lower level in order to save this water. It is clear that plaintiffs while contending that such a saving is possible, also contend that they have the right to store in the reservoir and use on the new and old lands the full quantity of water awarded them in the Cox Decree if it is available, throughout the year regardless of what effect it may have on the quantity of water available for the use of the lower water users on this river system. As we shall later demonstrate plaintiffs have no such rights. However, the evidence supports their first contention that by storing the water now used to flood their lands and using it to irrigate them when it will do the most good, and by lowering the water table in their meadow lands, they can prevent a wasteful consumption of water. This is proven by the records, which show that in the past they have diverted much more water per acre than the lower users. So it seems probable that by such changes they can increase the efficiency of the water which they use and thereby obtain some water for new lands without depriving the lower users of any quantity of water which they would have had without the changes. We conclude that the applications must be allowed but only on condition that the applicants make the changes outlined above in the use of their water in accordance with their testimony on that question so that such changes into storage and use on other lands will be made without increasing the amount or quantity of water consumed under such changes over the amount and quantity of water which would have been consumed had no change in the use been made. This requires that the vested rights of the lower users shall not be impaired by such changes either by reducing the flow of water which shall thereafter flow past the Kingston

measuring station for the use of the lower users or by changing the time of such flow to their detriment. It requires the same flow of water past that measuring station as long as such change shall be in operation as would have flowed past that station under the same diversion works and systems in operation prior to the changes, while irrigating the same land, supplying the same culinary water and growing the same kind of crops as were grown prior to the changes, not for 7 months of the year but for each and every day of each and every year while such changes are in operation.

■ 2. Under the circumstances of this case defendants have a vested right to the use of all of the water which would be available for their use without the proposed changes. If these changes decrease the quantity of water available for their use in the future their vested rights will be impaired.

Plaintiffs claim that throughout the years they have diverted and beneficially used substantially all of the available waters awarded to them by the Cox Decree. From the evidence it is clear that a large percentage of such waters awarded to them have not been consumed by such use but have returned to the stream above the Kingston measuring station. This is especially true during the non-irrigation seasons. The records show that during the months of January, February, March, April, November and December, the average flow of water at the Kingston measuring station has been much larger than it has been at the Hatch measuring station higher upstream, but during the months of May, June, July, August and September, the season of heavy irrigation, the reverse is true. Thus it is clear that the consumptive use of the water during the non-irrigation season has been small as compared with that of the irrigation season. The lower users have acquired a vested right to use all the unconsumed waters which would come down the stream to them under the use made of the water by the upper users and the conditions existing at the time they made their appropriations. The upper users cannot by a change in place of diversion or by a change in the place or nature of use consume more water than would have been consumed without the change and thereby deprive the lower users of their right to use such waters without impairing the vested rights of such lower users.[3] This is almost universally recog-

3. Crockett v. Jones, 47 Idaho 497, 277 P. 550; In re North Powder River, 75 Or. 83, 144 P. 485, 146 P. 475; Columbia Min. Co. v. Holter, 1 Mont. 296; Vogel v. Minnesota Canal & Res. Co., 47 Colo. 534, 107 P. 1108; Haberman v. Sander, 166 Wash. 453, 7 P.2d 563; Strickler v. City of Colorado Springs, 16 Colo. 61, 26 P. 313; Hall v. Blackman, 22 Idaho 556, 126 P. 1047; Washington State Sugar Co. v. Goodrich, 27 Idaho 26, 147 P. 1073; Farmers' High Line Canal & Reservoir Co. v. Wolff, 23 Colo.App. 570, 131 P. 291; Broughton v. Stricklin, 146 Or. 259, 28 P.2d 219, 30 P.2d 332.

nized. Hutchins " * * * The Law of Water Rights * * *" page 378, says:

"The appropriator is entitled to have the stream conditions maintained substantially as they existed at the time he made his appropriation. This applies equally to senior and junior appropriators; the junior appropriator initiates his right in the belief that the water previously appropriated by others will continue to be used as it is then being used, and therefore has a vested right, as against the senior, to insist that such conditions be not changed to the detriment of his own right. This applies specifically to a change in place of use or diversion the effect of which will be to injure the holders of established rights. It is therefore a condition precedent to the right to make any change in diversion, place of use, or character of use, that the rights of existing water users be properly safeguarded from injury resulting from the change. * * *"

Kinney on Irrigation and Water Rights, 2nd Ed., § 870 says:

" * * * For this purpose the uses of water acquired by an appropriation may be divided into two classes—those which practically consume none of the water and those which practically consume all of the water. Of course, these are the extreme cases, and there are all degrees between; but the extent of the appropriator's claim is limited to the needs of the purpose for which he makes the appropriation. And if the original purpose is for the generation of electrical power, which comes under the first class above named, and consumes none of the water, it is obvious that he can not change his use to that of irrigation, which comes under the second class, and which would consume all of the water, where the rights of subsequent appropriators have vested, and which rights would be injured by the change. Hence it follows that for the new use he can only consume an amount of the water equal to the amount consumed under the old use or a less amount. He can never consume more water for the new use than was consumed under the old use if the rights of others are injured thereby."

We have recognized this doctrine in Jackson v. Spanish Fork W. F. Irr. Co., Utah, 235 P.2d 918, where we held that the appropriator acquired only the quantity of water consumed with an additional amount of carrier water required to make the consumed water conveniently available and the unconsumed carrier water could not be used at a place where it would not be returned to the stream. In Tanner v. Humphreys, 87 Utah 164, 48 P.2d 484, where it was proposed to change the place of diversion and nature and place of use from irrigation to a domestic city use where there

would be no return flow, we recognized this as the correct doctrine but held that it was not applicable to that case because there was no protest by any of the parties whose rights could be impaired by the proposed change. In Manning v. Fife, 17 Utah 232, 54 P. 111, we held that an upper user who had appropriated a definite quantity of water prior to two lower appropriators, could not transfer to another for part of the time his rights to use such water in a different place and for a different purpose and thus deprive the lower appropriators of the use of such waters. This is so because the first appropriator's right was limited to the quantity of water required by the purpose for which he made the appropriation, and if such purpose at any time only required the use of the water for a part of the time it was his duty to turn the surplus down the stream for the use of lower appropriators in the order of their priority. Thus a change in place of diversion or the place or nature of use or a combination of such changes cannot be made if the lower users, whether prior or subsequent to the rights of the parties making the change will thereby be deprived of the use of water which they would have had under the use which the upper appropriators made before the change. Such a change would enlarge the rights of the upper appropriators and impair the vested rights of the lower users because their rights were established on the basis that no such enlargement or changes of use would be made after the lower users had perfected their appropriation, and this is true of storage as well as direct flow waters.

Plaintiffs contend that they can legally increase the quantity of water consumed in irrigating their lands by changing to more water consuming crops, by applying more water on their presently irrigated lands and by bringing under cultivation presently irrigated and even non-irrigated pasture lands. So, they contend that they should not be prevented from making the same increase in consumptive use by their proposed changes. Although it would be difficult to prevent plaintiffs from making such increased consumptive use of this water and assuming without conceding that they may rightfully do so, still, that is not controlling here for such increase would not require the approval of an application for a change of place of diversion or place or purpose of use of their waters. Under the express terms of our statute and under the common law of this state regardless of the statute, plaintiffs' proposed changes cannot be approved if they will impair the vested rights of the lower users by decreasing the quantity of water which will come down to them or by otherwise detrimentally interfering with their use of such waters. We therefore conclude that defendants have a vested right to have the same quantity of water under such changes as they would have had without them and that the time when such water shall be available to them shall not be materially changed so as to detrimentally interfere with their use of

such waters. Even if plaintiffs could increase the amount of water consumed by changing the kind of crops, the manner of use and intensity of irrigation as they claim under conditions which require no application for a change, they cannot do so under such an approved application for such changes for that would be directly contrary to the statute. So no allowance can be made to plaintiffs for water which they might claim they would have used if the change applications were not allowed. The determination of the amount of water which must flow past Kingston must be decided from past records of what has been the flow at that point under similar natural conditions to the conditions on the day for which the flow is being determined. It must be determined entirely from past records without regard to what they might claim they would have done under the old system.

They further contend that under Smithfield West Bench Irr. Co. v. Union Central Life Ins. Co., 105 Utah 468, 142 P.2d 866; Id., 113 Utah 356, 195 P.2d 249; and Lasson v. Seely, Utah, 238 P.2d 418, 422, they have a right to completely consume all the water which they divert onto their lands by using it over and over again, or by conveying it to other lands or by leasing it to others or storing it in a reservoir, as long as they do so before it gets off their lands and out of·their control. In the Lasson case we said:

" * * * While the water is under his dominion and control, he is entitled to use it on his own land in such beneficial manner as he sees fit, or he may use it or any part thereof on other land under his control, or he may lease to others the right to use such water or some portion thereof. As stated in Smithfield West Bench Irrigation Co. v. Union Central Life Ins. Co., 105 Utah 468, 472, 142 P.2d 866, 868: ' * * * While in his ditch or upon his land it was his property and he could use it as he saw fit. When the · water reaches the lower end of his land, he may again gather it into a ditch and convey it to any other land, ditch or reservoir he desires for further use; or he may lease or sell it. * * *'"

These cases did not involve a change of place of diversion or place or manner of use nor the rights of upper and lower water users on a natural stream. There the waters in question were originally diverted by an upper canal company and reached the lower users' lands only through that means after they had been abandoned but before they had reached the stream from which they were originally diverted. It is generally recognized that such lower user, even though he may by appropriation acquire the right to use such waters as reach his lands from such source, either directly from the higher lands or through

a natural water channel,[4] can acquire no right to have the upper user divert and bring such water onto the upper user's land from where it will become available for the irrigation of the lower user's land before it reaches the stream from which it was originally diverted. The upper user in such case owed the lower user no obligation to bring such water to him; he could abandon the diversion from the stream altogether and thereby deprive the lower user of all of such waste or surplus water. Under such conditions the lower user can acquire no vested right against the upper user who first diverted the water from the natural stream and brought it to him either by appropriation, adverse user, estoppel, acquiescence or other means, to compel him to continue such practice.[5] But a lower user of the water of a natural stream, as we have seen, acquires a vested right as against all upper users that they shall not increase the amount of water consumed after he makes his appropriation by a change of place of diversion or place or manner of use and thereby deprive him of the use of such water.[6]

4. See McNaughton v. Eaton, Utah, 242 P. 2d 570; Hutchins "* * * The Law of Water Rights * * *", pp. 127–137 and 362–368.

5. See McNaughton v. Eaton, supra; Hutchins "* * * The Law of Water Rights * * *" 362–368; Sebern v. Moore, 44 Idaho 410, 258 P. 176; Ryan v. Gallio, 52 Nev. 330, 286 P. 963; Garns v. Rollins, 41 Utah 260, 125 P. 867, Ann. Cas. 1915C, 1159; Joerger v. Pacific Gas & Elec. Co. 207 Cal. 8, 276 P. 1017; Wedgworth v. Wedgworth, 20 Ariz. 518, 181 P. 952; Mabee v. Platte Land Co., 17 Colo.App. 476, 68 P. 1058; Hill v. American Land & Livestock Co., 82 Or. 202, 161 P. 403; Hagerman Irr. Co. v. East Grand Plains Drainage Dist., 25 N.M. 649, 187 P. 555; West Side Ditch Co. v. Bennett, 106 Mont. 422, 78 P.2d 78; Evans v. Prosser Falls Land & Power Co., 62 Wash. 178, 113 P. 271; Binning v. Miller, 55 Wyo. 451, 102 P.2d 54.

6. See Hutchins "* * * The Law of Water Rights * * *" pages 362–368, where it is said: "Appropriations may generally be made of waste water which has been abandoned by the original appropriators, but with important qualifications. Generally, an independent right to the use of abandoned or waste water can be acquired only if the water has not yet returned to the stream from which it was diverted. If such water after abandonment has re-entered a portion of the stream system from which it was originally appropriated, as noted in greater detail below, it becomes a part of that watercourse in legal contemplation as well as physically, and from the standpoint of rights of use, it is just as much a part of the flow as is the water with which it is mingled; hence appropriative rights which before the mingling have attached to the waters of the stream attach with equal effect to the waste waters originally diverted from the stream and then abandoned into it, so that an independent appropriation cannot then be made of the waste waters as such * * *."
"* * * These waste-water appropriations, however, are not vested with all the attributes of a true appropriative right, for it appears to be settled that the waste-water claimant does not thereby acquire, solely by virtue of such appropriation, a vested right as against the original appropriator to have the practice of wasting water for his particular benefit continue. * * *"
"The rights of junior appropriators, in other words, may be involved in a

■ Defendants' evidence tends to show that during the non-irrigation seasons, especially during the winter, plaintiffs have never diverted or used all of their decreed rights. This is confirmed by the river commissioner's records and assumed by plaintiffs' experts. Even their attorneys concede that at times they have not diverted or used all of their decreed rights. They refer to them as "gratuitous waters," meaning waters which are a part of their decreed rights which they have not used because at the time their lands were fully saturated from rain, snow, the spring run-off or from irrigation or because their ditches needed cleaning, or their crops needed to be cultivated or harvested or because the snow was too deep or the weather too cold or because floods have washed out some of their dams or ditches. They argue that failure to use such waters do not show an abandonment of their rights. Our problem is not whether plaintiffs have abandoned their rights but whether they ever acquired the right by such changes to deprive the lower users on the stream of the right to such water which the lower users have used continuously since they initiated their appropriations. Our statute clearly says no such change shall be made if it impairs any vested right. In applying this statute we must look to the lower users to see if their rights will be impaired by such changes not to the persons wishing to make the change to see that they have the full amount of their decreed rights. As previously demonstrated, the lower users have vested rights to the use of all of the waters of this stream which would reach their diversion works under the conditions existing and the uses being made at the time they acquired their rights. If by these proposed changes plaintiffs will decrease the quantity of water consumed by their use and thereby deprive the lower users of the use of such waters their vested rights will be impaired. This is just as true where the waters were not consumed in the past because they were not used as it is where they were used and still not consumed. The defendants have the same vested rights that the quantity of water available for their use shall not be decreased nor the time when it reaches them changed to their detriment

claim that waste waters shall continue to flow from irrigated lands. The appropriator's right to divert water for irrigation extends only to the quantity necessary for that purpose; 'any excess of the amount so needed properly belonging to the natural stream or source of supply and should be left there.' [Lambeye v. Garcia, 18 Ariz. 178, 179, 157 P. 977]. He cannot give away, waste, or otherwise dispose of his surplus water to the injury of subsequent appropriators. Some waste is of course inevitable in irrigation practice (see Ch. 1, Classification of waste waters); nevertheless it is clearly to the interest of each appropriator that all senior appropriators from the same source of supply exercise their rights with the least practicable waste, and that no enlargement of the specific or implied terms of a given right to the detriment of junior stream appropriators result from the claim of a third party that excessive use of water shall continue for his benefit. * * * "

in one case as in the other. So no allowance can be made in plaintiffs' favor on account of these so-called gratuitous waters.

■ **3.** Plaintiffs' proposed changes will not create an impossible administrative problem. All the above ground flow of water from the south fork which reaches the lower users of the Sevier River flows past the Kingston measuring station. If the same flow in volume and quantity is maintained from day to day at that station in operating under the proposed changes as would have flowed past that station without the changes, defendants' vested rights will be fully protected. To compute and determine under the operation of the changes what the amount of such flow would have been without the changes presents a difficult problem, for it is impossible to verify the accuracy of such computation by actual test. However, there are records for many years past of the flow of water at the Kingston and Hatch measuring stations and other such stations on the sources of water which make up this river stream. There are also records of the water fall on this water shed, of the water content of the snow which has accumulated in past years on various snow courses thereon, of the temperature and water content of the atmosphere and of other conditions which would affect the flow at Kingston. The record contains much expert testimony to the effect that in future years with the system operated under the proposed changes, the amount of the water flow which would have passed Kingston from day to day under the old system can be determined with reasonable accuracy, and the trial court made findings to that effect. The State Engineer in rejecting these applications held that they would create an impossible administrative problem and gave testimony to that effect on the trial. The record contains much expert testimony to the effect that in future years with the system operating under the proposed changes, the amount of the water flow which would have passed Kingston from day to day under the old system without any man-made changes in the conditions can be determined with reasonable accuracy and the trial court made findings to that effect. The responsibility of making the final decision is by law placed on us and not on the engineer; we respect and give great weight to his opinion because he is an expert on such matters and we regard him very highly in that field, but after due consideration of all the evidence we are convinced that the preponderance is contrary to his opinion and in accord with the decision of the trial court on this question and we so hold.

The plaintiffs' applications must therefore be granted only on condition that the amount and quantity of water flowing at the Kingston measuring station on each and every day of every year operating under such changes must be maintained the same as it would have been had the operations continued under the old system without the changes being made. The amount of such flow must be determined by

a comparison of the natural conditions which exist on the day for which the calculation is being made with the past records of times when similar natural conditions have existed. This does not mean that the records of the past must be searched for the year which is more nearly similar to the year for which the calculations are being made and that the flow at Kingston must be maintained the same as it was throughout such similar previous year for there are no two years in which the conditions do not substantially differ part of the time. In making the calculations, all of the past records must be considered which tend to throw light on the problem, and due allowances must be made for all differences in the natural conditions which would tend to affect the volume of the flow at the Kingston measuring station.

■ 4. The problem of enforcing and administering the water in question if these proposed changes go into operation should be left largely under the direction of the State Engineer and the water commissioners, where the law has placed it. In order to keep the actual flow past the Kingston station as nearly as possible the same as it would have been without the changes, it seems advisable that two calculations be made thereof; one before and another after the day in question. The calculation before to be made in order to determine and arrange in advance for the exact quantity of water to flow past that station on the day in question, and the one after that day should be made in the light of intervening conditions and events to correct any inaccuracies which then appear in the first calculations. Some of the rights of lower users and reservoir companies are dependent on the amount of and the time when such water enters the system; in determining these rights the last calculation should always be used and figured as of the day for which such computation was made. The last calculation should be made as early as is accurately and conveniently possible, and since the changes are made at the request and for the benefit of the plaintiffs, they should bear any expense occasioned thereby; and in making the computations, defendants should be given benefit of doubts and uncertainties therein. In case of corrections in the last computations, the water should be transferred in accordance therewith as soon thereafter as possible. We anticipate no difficulty in making such corrections if storage is made available at the Hatch town damsite along with the available storage now existing for the lower users and the practice of holding over waters for emergencies.

The court's order relieving the state engineer and water commissioners from the responsibilities of administering these waters after the changes are effected is reversed. The responsibility of administering the division of the waters of such streams was by the Legislature wisely placed on the State Engineer because he would be disinterested and not prejudiced in favor of one side or the other. To place that responsibility on

the plaintiffs would be to invite favoritism and was prejudicial to the defendants.

The case is remanded to the district court to amend its findings and judgment to conform to the views expressed in this opinion. Costs to appellants.

McDONOUGH, C. J., and CROCKETT, J., concur.

WORTHEN, J., does not participate herein.

HENRIOD, Justice (concurring in part and dissenting in part).

I concur in part and dissent in part. Since the majority opinion permits the change of point of diversion and place and nature of use of the water, from a direct flow, beneficial winter use, to storage, I agree that any approval thereof should be 1) without impairment of vested rights and that 2) distribution should be administered, not by the litigants, as the lower court required, but by the State Engineer. On the other hand, besides believing we have adjudicated priorities and rights, as we have said we cannot do,[1] I believe it impossible to administer the waters under the change allowed.

The applicants for this change of time and place of use, or their predecessors, were *decreed* rights under the Cox decree of 1936, which included 74 second feet of water to be *used* beneficially *during the period from November 1 to March 31 annually*. The rights under the decree were funneled into two categories: 1) direct flow and 2) storage rights all of which clearly were defined as to quality, quantity and time of use, *the water not used beneficially to be returned to the stream*. The applicants have no decreed storage rights, although the owners of the Sevier Bridge and Piute reservoirs have such rights. Applicants now seek to *change* their *direct flow winter use rights* to *storage* rights so as to be able to use the water, most of which ordinarily would course down the Sevier in the wintertime, *whenever the applicants might need it*,—be it the following summer, two summers hence; in 1965; or never; whether it be on their present lands, on 5,000 new acres; on both, or neither; whether in the Sevier watershed, some other watershed, or "by dumping it;" in the words of applicants' counsel, "into the Colorado River." To say, as has been said, that such a change of point of diversion, place and nature of use, does not modify the Cox decree simply is to blind oneself not only to reality but to the plain meaning of language.

It is difficult to read the main opinion and determine who won this case or how its terms and conditions can be complied with effectively. It appears that it requires the same amount of water to go down the river as would have gone down had the change been disallowed, which, of

1. U. S. v. District Court, Utah 1951, 238 P.2d 1132.

course, would be an amount of water less the amount applicants would have used beneficially during the 5 winter months, 74 second feet, or about 22,000 acre feet if they had used all the water to which they were entitled during those months,—with necessary adjustment made, of course, for return flow above the Kingston station. Calculating the water passing Kingston under this formula necessarily must include as a factor, that part of the 74 second feet decreed to applicants that they *would have used* during the current year but for the change in use. The State Engineer would be powerless to determine what that figure would be without asking the people who would have used the water but for the change. Those people testified at the trial that they beneficially used *all* of the winter water to which they were entitled during the 5-month winter period, and there is no reason to believe that, if asked by the State Engineer, they would state that they would have used less during the current year, but for the change. Therefore, if the State Engineer uses 74 second feet as the amount of water that would have been used during the current year but for the change, it follows that the applicants could store and use beneficially the entire 74 second feet during the 5 months in question. Expert opinion, shared by this court in its language, discounted such use, and indicated that the full 74 second feet no doubt never were used beneficially,—the exact quantity of such water beneficially used being unknown and unmeasured to

that date. Using such figure,—and it is impossible to determine what other figure the State Engineer could use,—probably would result in a loss by lower users of considerable quantity of water that previously flowed down the river and to which the main opinion says the lower users had vested rights. Such a result would seem inimicable to the Cox decree which Sevier users have relied upon for many years in determining their water rights.

It is suggested respectfully that other language of the main opinion could be interpreted, although inconsistently, to reach a result opposite to that mentioned hereinabove. The opinion in substance says that measurement at Kingston must be accomplished by comparing the flow with that of a previous year having similar *natural* conditions, or strictly on a climatic basis, indicating, it would seem, that the factor of water beneficially used during the previous year,—an *artificial* condition or factor,—could not be taken into account in determining the daily volume required to flow past Kingston. Weight is further given to the idea that such factor should be excluded in the computations to be made when the court says that "no allowance can be made to plaintiffs for water which they might claim they would have used." Eliminating such factor, it would seem that the water passing Kingston would not have to be the same quantity as came down in a previous year where water in an unknown quantity had been used beneficially by applicants, which never reached the Kingston

station, but which nevertheless affected the quantity passing Kingston. It would follow, under such formula that the upper users would suffer and the lower users would be the beneficiaries, since the applicants would have to supply a quantity of their decreed water for flow past Kingston, which they would have beneficially used but are not going to use in the current year, and since they are not allowed, under the decision, to use that water as a factor in determining what must flow past Kingston. If the State Engineer used the same figure, 74 second feet, in calculating the flow under this formula, and it is difficult to determine what other figure he could use, the applicants actually would have to produce and send past Kingston, 74 second feet of water that they perhaps never would have used beneficially during the current year,—and if they had to send it down the river, they could not store it.

No matter how you approach this problem of measurement; it would seem impossible for the State Engineer to send down the Sevier, past Kingston, an amount of water that *would have gone down the river but for the change,* because one of the factors that determines the amount of water that would have gone down the river but for the change, is the quantity of water that the applicants *would have used beneficially during the 5 winter months,—a quantity* that is determinable only by the statements and opinions of those who either have used

the water beneficially in past years or *would have used the water but for the change,* there being no accurate records relating to quantity of water beneficially used in the 5 winter months in any past year, whether it was similar climatically to the current year or not. The factor of quantity of water beneficially used in the past, or the factor of what quantity of water would have been used during the current year but for the change in use, cannot be ignored, cannot be calculated on past or present records or data, and cannot be estimated except by asking interested parties who already have set the figure at 74 second feet by their testimony at the trial, which, as has been pointed out, the experts and this court, have discounted as being inaccurate.

The writer would hazard a prediction that if, on the strength of this decision, the applicants build the dam at an expense running perhaps into seven figures, the many rights stemming from use of waters from this unique river system will be the fountainhead of limitless and bitter litigations. The dam, once completed, will have become a fait accompli, followed by a natural reluctance to disturb the then status quo, but the matter of vested rights will continue to echo through the Sevier basin.

The majority opinion takes considerable space and quotes at great length from various authorities to point out that lower "appropriators" have a right to have water come down the stream in volume and at times it customarily came down before the

appropriation. The writer believes such statements and the authorities cited are not pertinent here. This is a case of *decreed* rights, not one of appropriation as was the situation before the Cox decree. The applicants have 74 *decreed* second feet of winter water for beneficial use. If they use but 50 second feet in one year, there is no reason to believe and the law does not establish that they have abandoned their rights to use the other 24 second feet in a later year. The 50 second feet may have been sufficient to raise a crop of potatoes, while the next year may require 74 second feet to produce a stand of thirstier alfalfa. So long as the applicants *use* all or any part of their decreed rights *beneficially* and *within the time or season for which it was decreed,* they can vary the amount of water used from year to year so long as they do not exceed the decreed maximum, without losing their rights and without conferring any rights, necessarily, upon lower users, to demand that all water decreed to upper users but not used in that year when the least amount was used shall thereafter be sent down the river to the lower users. The lower users merely benefit by failure of upper decreed right users to use all their decreed water in any particular year. To hold otherwise would seem to sterilize general adjudication decrees. For the reasons mentioned I cannot ascribe to the statements in the majority opinion to the effect that the same amount of water must pass Kingston after this change as would have passed under the same diversion system in operation prior to the change, when applicants were "irrigating the same land, supplying the same culinary water and growing the same kind of crops *as was grown prior to the changes.*"

The applicants, in urging approval of their application for change of diversion point, place and nature of use, point out that they might vary the amount used per season depending upon the thirstiness of the crop they plant, and they reason, therefore, that if they use less than the decreed amount they should be allowed to store what they could have used. This reasoning is fallacious since the less-consuming use, after all, is *the* use, and the *beneficial* use, and decreed water not beneficially used, under the Cox decree, must be returned to the stream,—not stored.

I am of the opinion that administration of the distribution of the water is a practical impossibility both under the facts reflected in the record, and under the terms and conditions of the majority opinion, and that counsel's statement is significant in that respect when he says that "the flow of a river depends upon many factors, some of which are depth of snow cover; water content of snow; time incidences at which the seasons commence; abruptness or gradualness of temperature changes from season to season; absorptive qualities of the soil; wind factors; rain storms; rainfall infiltration runoff; and the extent to which farmers along the river system deem it desirable to use their decreed rights." His

further statement seems equally significant when he said that "records of river yield at the Kingston Gaging Station kept for 40 years indicate that there has been no year in that whole period of time which can be considered to be similar to another year."

Add to these variables the factor of quantity of water beneficially used during the winter months,—a factor unknown and indeterminable, as is the factor of quantity of water that would have been used but for the change in use,—a factor essential and necessary not only to devise but effectively to administer a formula which requires the same amount of water to pass a designated point *as would have passed there had the change of point of diversion, place and nature of use, been disallowed,* and it would appear inescapable that it is not only impossible to divide the water accurately to insure a quantity equal to that which would have gone down the river but for the change, but it is impossible even to establish the formula itself.

Under such circumstances, to say, as does the majority opinion, that the "Plaintiffs' proposed changes will not create an impossible administrative problem", is to discount the judgment of the State Engineer, when he said the change would "impose an impossible problem of distribution," and is to attribute to the State Engineer an omniscience quite out of harmony with the emoluments of his office, quite out of harmony with his own stated opinion, and quite out of harmony with our own decision which, while discounting his judgment, approves and insists on employing his judgment by appointing him arbiter and purveyor of the sensitive waters of the Sevier.

I am convinced that by our decision we have given none of the litigants a yardstick by which they can determine their rights under the Cox decree or under the now approved application for change of point of diversion, place and nature of use.

WORTHEN, J., not participating.